2010 WY 23

Bryon THROCKMARTIN and Vanessa Throckmartin, Appellants (Plaintiffs),

v.

CENTURY 21 TOP REALTY, a Wyoming corporation; and Kathie Hove, Appellees (Defendants).

Bryon Throckmartin and, Vanessa Throckmartin, Appellants (Plaintiffs),

v.

Vicki Means Nelson; and Real Estate Professionals, Inc., a Wyoming corporation, d/b/a Re/Max Professionals, Appellees (Defendants).

Nos. S–08–0250, S–08–0269.

Supreme Court of Wyoming.

March 3, 2010.

Representing Appellants: Jessica Rutzick, Jackson, Wyoming; and John R. Vincent, Riverton, Wyoming. Argument by Ms. Rutzick.

Representing Appellees: Billie L.M. Addleman and Gary R. Scott, Hirst Applegate, LLP, Cheyenne, Wyoming, representing Century 21 Top Realty and Kathie Hove; and *Phillip T. Willoughby, Casper, Wyoming; P. Craig Silva and Patrick J. Murphy of Williams, Porter, Day & Neville, P.C., Casper, Wyoming, representing Vicki Means Nelson and Real Estate Professionals, Inc.,

* Order Allowing Withdrawal of Attorney entered on February 26, 2009.

d/b/a Re/Max Professionals. Argument by Messrs. Addleman and Silva.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] In November of 2005, Bryon and Vanessa Throckmartin purchased a house in Gillette. In August of 2006, they discovered that the basement of the house leaked very badly during significant rainfall, that the foundation had crumbled, and that the house was becoming uninhabitable. Eventually it was condemned by the City of Gillette in mid–2007—a total loss for the Throckmartins. They filed suit naming two real estate firms (and their respective agents) as defendants, as well as the sellers of the home and the home inspection experts who inspected the home for the Throckmartins, prior to closing. The district court granted summary judgment in favor of the real estate firms and their agents in each of the captioned appeals. Other litigation remains pending in the district court with respect to the sellers and the inspection specialists.

[¶ 2] The Appellants in Case No. S–08–0250 are Bryon and Vanessa Throckmartin (Throckmartins). The Appellees are Century 21 TOP Realty (TOP) and Kathie Hove (Hove) (during proceedings below it was explained that Century 21 and TOP are no longer associated). TOP is a real estate brokerage firm and Hove is a sales representative and associate broker who worked for that firm. The Throckmartins claimed that Top Realty and Hove engaged in professional negligence, breached the contract between them, engaged in fraudulent concealment of defects in the home, and breached the duty of good faith and fair dealing implied in their contract and articulated in applicable statutes. Hove was a real estate agent who provided services to the Throckmartins in their endeavor to buy their first home.

[¶ 3] The Throckmartins are also the Appellants in Case No. S–08–0269. The Appellees are Vicki Means Nelson (Nelson) and Real Estate Professionals, Inc., d/b/a Re/Max Professionals (Re/Max). Nelson and Re/Max had listed for sale the home which is at issue

in this case and another employee of Re/Max was the first to show the Throckmartins that home.

[¶ 4] We will affirm both of these cases.

## ISSUES

[¶ 5] In Case No. S–08–0250 the Throckmartins raise this issue:

Did the district court erroneously grant summary judgment in favor of Hove and Century 21 TOP Realty on [Throckmartins'] claims against them for professional negligence, breach of contract, breach of duty of good faith and fair dealing, and fraudulent concealment?

TOP and Hove restate the issues like this:

1. Whether [Throckmartins] can now assert a claim for professional negligence not previously plead?

2. Did the district court correctly grant [TOP] and [Hove] summary judgment on [Throckmartins'] claim for breach of contract?

3. Did the district court correctly grant [TOP] and [Hove] summary judgment on [Throckmartins'] claim for breach of the duty of good faith and fair dealing?

4. Did the district court correctly grant [TOP] and [Hove] summary judgment on [Throckmartins'] claim for fraudulent concealment?

In their reply brief, the Throckmartins contend they did make a timely claim sounding in professional negligence, that real estate professionals must abide by professional standards other than those found in Wyo. Stat. Ann. §§ 33–28–301 through 33–28–311 (LexisNexis 2009), that the "intermediary" statute does not supersede the duty of care established in *Hulse v. First American Title Co.* (*Hulse I*), 2001 WY 95, 33 P.3d 122 (Wyo.2001), and *Hulse v. BHJ, Inc.* (*Hulse II*), 2003 WY 75, ¶ 10, 71 P.3d 262, 268 (Wyo.2003), and that a question of fact exists as to whether Hove breached the duties set forth in the Real Estate License Act.

[¶ 6] In Case No. S–08–0269, the Throckmartins challenge the district court's order granting summary judgment in favor of Nelson and Re/Max. Nelson was the listing/sell-

ing agent for the parcel of real estate at issue in this appeal. She worked for Re/Max. In the initial pleadings another Re/Max agent was also named as a defendant, Val Elliot. Elliot was eventually dismissed by stipulation of the parties, but her testimony affected the claims against Nelson and Re/Max, and we will recite portions of her testimony in our rendition of the circumstances that must be considered in resolving this case. The home the Throckmartins purchased was listed with Re/Max, by the sellers. The issue raised in this appeal is simply stated to be:

> Did the district court erroneously grant summary judgment in favor of [Nelson] and [Re/Max] on [Throckmartins'] claims against them for professional negligence, breach of contract, breach of the duty of good faith and fair dealing, and fraudulent concealment?

In response, Nelson and Re/Max provide this statement of the issues:

> The district court properly granted summary judgment in favor of [Nelson] and [Re/Max] because there were no genuine issues of material fact and [Nelson] and [Re/Max] were entitled to judgment as a matter of law.
>
> [A.] Issue regarding contract:
>
> The district court properly found that there were no genuine issues of material fact and there was no contract between Throckmartins and [Nelson] as a matter of law.
>
> [B.] Issue regarding disclosure:
>
> The district court properly found that there were no genuine issues of material fact and there was no violation of Wyo. Stat. Ann. § 33–28–111 as a matter of law.
>
> [C.] Issue regarding malpractice:
>
> Throckmartins improperly raised on appeal for the first time a claim for real estate malpractice/negligence.
>
> [D.] Issue regarding breach of covenant:
>
> The district court properly found that there were no genuine issues of material fact and as a matter of law, there was no contract and because there was no contract there could be no breach of the covenant of good faith and fair dealing.

The Throckmartins assert in their reply brief that they did make a timely claim for professional negligence against Nelson and Re/Max, that there are genuine issues of material fact as to whether Nelson and Re/Max breached their duties to the Throckmartins, and that the provisions of § 33–28–303 are only the minimal standards by which realtors must abide.

## FACTS AND PROCEEDINGS

[¶ 7] The Throckmartins were referred to Hove by a real estate finance company employee when they first began looking to buy a home in the late summer of 2005. Hove showed the Throckmartins several new construction homes that qualified for the sort of Wyoming Community Development Authority (WCDA) loan the Throckmartins were seeking at that time. Those houses were under construction but not yet finished. Later, when Mrs. Throckmartin became employed, they qualified for different sorts of financing (other than WCDA first-time home owner loans), as well as for a larger loan (up to $175,000.00, which was the selling price of the home they eventually purchased).

[¶ 8] The Throckmartins spotted a home they fancied which was offered for sale through Re/Max. They sought out a different real estate agent who worked for Re/Max, not realizing that that was not the usual way of utilizing the services of a real estate agent. However, no problems arose from the inclusion of that secondary real estate professional, other than that Hove did not show the Throckmartins the home that they were intent on buying. Instead it was shown to them by a Re/Max agent. Hove first saw the house on October 24, 2005, when she went over to that house (at the Throckmartins' request) to admit the home inspectors engaged by the Throckmartins. A property condition statement covering that property had been provided to Hove, and in turn to the Throckmartins. That condition statement revealed that there were problems with basement walls, but Mr. Throckmartin had discussed that directly with the seller and was apparently satisfied with the explanation provided. The Throckmartins asked Hove to find a home inspector for them (because they did not have the time to do so themselves),

and Hove proceeded to seek out a suitable inspector. Hove contacted inspectors until she found one who was able to do the inspection in a manner that satisfied the Throckmartins' time lines. A copy of the property condition statement was not provided to the inspector by Hove or by the Throckmartins. The Throckmartins were very excited about the house and wanted to buy it very quickly.

[¶ 9] Val Elliot worked with Nelson at Re/Max. She recalled the Throckmartins coming into her office and asking to view the house they ultimately purchased. She related that at that time the real estate market in Gillette was very fast-paced and properties, especially those in that price range, did not stay on the market very long and there were not very many of them available for sale. She showed the Throckmartins only that one property and the owners of the house happened to be present at the time of that showing. Elliot felt that the Throckmartins made an "impulse" decision to purchase the house on the spot. Although Elliot had not seen the sellers' disclosure statement, she had some concerns about the house because the roof looked "worn." Since the sellers were present when they looked at the house, Mr. Throckmartin talked with one of the owners, Nathan Neether, about the condition of the house. The sellers were there because they were in the process of moving out and cleaning/fixing up the house. Elliot did not talk to the owners of the house. The Throckmartins followed Elliot's advice to the extent that they did not make an offer that same day. Once Elliot found out that Hove was the Throckmartins' agent, she did not continue to participate in the sales process, although she did share in the commission for the sale.

[¶ 10] Mr. Throckmartin's deposition reveals that they first took note of the disputed property in July of 2005, and looked at it for the first time in late July or early August. He contacted Re/Max directly rather than working with Hove. Once he understood that he needed to work with Hove, who would in turn work with Re/Max, that's what was done. The Throckmartins decided immediately that they wanted the house, but they had to wait for the processing of the paper-

work before an actual offer was made. A few weeks after the Throckmartins took their initial look at the house, they went back and looked again after the owners had moved out. They arranged for an inspection of the house before making their purchase. The Throckmartins made their offer to purchase the disputed house on October 14, 2005. The seller's property condition disclosure statement was made available to the Throckmartins. They closed on the property on November 30, 2005, and moved in shortly thereafter. Mr. Throckmartin's testimony was to the effect that both Hove and Nelson should have known about the poor condition of the house, but based that only on the circumstance that they were in the real estate business and they should know about the condition of houses they are selling. He eventually conceded he had no personal information or knowledge that either Hove or Nelson actually knew about the defects in the house at issue. Mr. Throckmartin then enumerated the problems that came to light beginning in August of 2006, and ending with the condemnation of the house in 2007.

[¶ 11] Testimony from Hove indicated that the builder of the home lived in it in the period of approximately 1969–70, and from this it was deduced that it was built in the 1960's. The home's basement walls were constructed of non-reinforced cement blocks and showed considerable signs of bowing. Similar homes constructed by the same builder and located in the same neighborhood had experienced some similar foundation problems. The house the Throckmartins purchased had been inspected in 2002 and that inspection resulted in a report that some of the basement walls were not structurally stable, although the condition of most of the basement walls could not be determined because they were covered with paneling. That report also concluded that the house was not suitable for occupation as a residence. The owners from whom the Throckmartins' made their purchase had bought the home "as is" and without having inspections done. An inspector who was familiar with the area where the Throckmartins' home was located indicated that he had inspected about 25 homes in that area that had problems

similar to those experienced by the Throck-martins.

## STANDARD OF REVIEW

[¶ 12]  Both cases were resolved by summary judgment pursuant to W.R.C.P. 56.  In *Loredo v. Solvay America, Inc.*, 2009 WY 93, ¶ 10, 212 P.3d 614, 618–19 (Wyo.2009) (quoting *Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶¶ 8–9, 148 P.3d 8, 12–13 (Wyo.2006)), we summarized the generally applicable standard of review:

> We evaluate the propriety of a summary judgment by employing the same standards and using the same materials as the district court.  *Cook v. Shoshone First Bank*, 2006 WY 13, ¶ 11, 126 P.3d 886, 889 (Wyo.2006).  Thus, our review is plenary. *Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 7, 75 P.3d 640, 647 (Wyo. 2003).
>
>> Wyo. R. Civ. P. 56 governs summary judgments.  A summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c).  When reviewing a summary judgment, we consider the record in the perspective most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may be fairly drawn from the record.  We review questions of law de novo without giving any deference to the district court's determinations.
>
> *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 11, 123 P.3d 579, 586 (Wyo.2005), quoting *Baker v. Ayres and Baker Pole and Post, Inc.*, 2005 WY 97, ¶ 14, 117 P.3d 1234, 1239 (Wyo.2005).
>
> "A genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Christensen v. Carbon County*, 2004 WY 135, ¶ 8, 100 P.3d 411, 413 (Wyo.2004) (quoting *Metz Beverage Co. v. Wyoming Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo. 2002)).  The party requesting a summary judgment bears the initial burden of estab-

lishing a prima facie case for summary judgment.  If he carries his burden, "the party who is opposing the motion for summary judgment must present specific facts to demonstrate that a genuine issue of material fact exists."  *Id.* We have explained the duties of the party opposing a motion for summary judgment as follows:

> "After a movant has adequately supported the motion for summary judgment, the opposing party must come forward with competent evidence admissible at trial showing there are genuine issues of material fact.  The opposing party must affirmatively set forth material, specific facts in opposition to a motion for summary judgment, and cannot rely only upon allegations and pleadings ..., and conclusory statements or mere opinions are insufficient to satisfy the opposing party's burden."

The evidence opposing a prima facie case on a motion for summary judgment "must be competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation."  Speculation, conjecture, the suggestion of a possibility, guesses, or even probability, are insufficient to establish an issue of material fact. *Cook*, ¶ 12, 126 P.3d at 890, quoting *Jones v. Schabron*, 2005 WY 65, ¶¶ 9–11, 113 P.3d 34, 37 (Wyo.2005).

## DISCUSSION

[¶ 13]  In the circumstances presented here, the applicable law is quite difficult to parse.  Mr. Neether and Ms. Neether–Oedekoven were trying to sell a house.  The applicable statute has this to say about "seller:" " 'Seller' means a person who is attempting to sell or exchange real property and includes landlords as that term is commonly used in the rental, leasing or management of real property[.]" § 33–28–301(a)(vi).  " 'Seller's agent' means a licensee who is authorized to represent and act for the seller in a real estate transaction[.]" § 33–28–301(a)(vii).

[¶ 14] Wyo. Stat. Ann. § 33–28–302 describes the relationships between licensees and the public:

(a) *A broker shall not be required to offer or engage in more than one (1) of the brokerage relationships.* When engaged in any of the activities enumerated in W.S. 33–28–102(a)(iii), a licensee may act in any real estate transaction as an agent or intermediary or may work with the seller or buyer as a customer. The licensee's duties and obligations arising from that relationship shall be disclosed to the seller or buyer pursuant to this article.

(b) When engaged in any of the activities enumerated in W.S. 33–28–102(a)(iii), a licensee may act as an agent only pursuant to a written agreement with the seller or buyer which discloses the duties and responsibilities set forth in W.S. 33–28–303 or 33–28–304.

(c) When engaged in any of the activities enumerated in W.S. 33–28–102(a)(iii), a licensee may act as a subagent with the duties and responsibilities set forth in W.S. 33–28–303(g), only pursuant to a written agreement between the seller and the seller's agent authorizing an offer of subagency to other brokers, or as an intermediary with the seller or buyer, which written agreement discloses the duties and responsibilities set forth in W.S. 33–28–305.

(d) Repealed by Laws 2009, ch. 20, § 3.

(e) A licensee may work with a single party in separate transactions pursuant to different relationships, including selling one (1) property as a seller's agent and working with that seller in buying another property as an intermediary or buyer's agent or subagent, if the licensee complies with this article in establishing a separate relationship in writing for each transaction.

(f) A licensee may complete real estate forms and shall explain to the parties the effects thereof if the licensee is performing the activities enumerated or referred to in W.S. 33–28–102(a)(iii) in the transaction in which the forms are to be used.

(g) *Every contract, duty or relationship within this article, including intermediary or customer relationships, imposes an obligation of good faith and fair dealing in its performance or enforcement.*

(h) If a real estate brokerage firm has more than one (1) licensee, the responsible broker and any licensee associated with or engaged by that responsible broker may be designated to work with the seller or the buyer as a designated agent. For an in-house real estate transaction, the designated agent shall be:

(i) A broker;

(ii) An associate broker; or

(iii) A salesman under the direct supervision of a broker, and the broker is not:

(A) A party to the real estate transaction; or

(B) A transaction manager.

(j) Licensees employed or engaged by the same responsible broker may be designated agents for different buyers or sellers in the same transaction. If the responsible broker is representing a buyer or a seller in an in-house transaction, the responsible broker shall immediately appoint a transaction manager. The simultaneous designations shall not constitute dual agency or require the responsible broker or licensee to act as an intermediary unless otherwise required by this article. A responsible broker or transaction manager shall have access to all necessary information but shall be prohibited from sharing any confidential information of any party to the transaction that the broker or manager may learn in the process of supervising the licensees or the transaction.

(k) A licensee may work as an agent for the seller treating the buyer as a customer or as an agent for the buyer treating the seller as a customer but not as an agent for both the seller and the buyer. A licensee may be designated to work as an intermediary for both the seller and the buyer in the same transaction. The applicable designated relationship shall be disclosed in writing to the seller and buyer at the earliest reasonable opportunity. A designated agent is not precluded from working with a buyer or seller in a real estate transaction solely because the agent was

precluded from representing that person in an earlier separate real estate transaction.

(m) No seller or buyer shall be vicariously liable for an agent's acts or omissions that have not been approved, directed or ratified by the seller or buyer.

(n) Nothing in this section shall be construed to limit the responsible broker's responsibility to supervise licensees associated with the broker or firm or to shield the broker from vicarious liability.

(o) *A licensee shall not establish dual agency with any seller or buyer.*

(p) A customer relationship shall exist between a licensee and any party to a real estate transaction unless a single agency or intermediary relationship is established through a written agreement between the licensee and the party or parties. When a buyer or seller is represented by another licensee, a licensee may work with the other buyer or seller as a customer, having no written agreement, agency or intermediary relationship with either party. *A licensee shall not owe any duty of confidentiality to a customer.*

(q) Proprietary ownership interest of listings shall be vested in the responsible broker. [Emphasis added.]

[¶ 15] The Throckmartins were buyers as that term is commonly understood: " 'Buyer' means a person attempting to purchase or exchange real property and includes tenants as that term is commonly used in the rental, leasing or management of real property[.]" § 33–28–301(a)(ii). " 'Buyer's agent' means a licensee who is authorized to represent and act for the buyer in a real estate transaction[.]" § 33–28–301(a)(iii).

[¶ 16] The duties and obligations of a "seller's agent engaged by seller," are set out in § 33–28–303:

(a) A licensee engaged by a seller to act as a seller's agent has the following duties and obligations:

(i) To perform the terms of the written agreement made with the seller;

(ii) To exercise reasonable skill and care for the seller;

(iii) To promote the interests of the seller with the utmost good faith, loyalty and fidelity, including:

(A) To seek a price and terms which are acceptable to the seller, except that the licensee shall not be obligated to seek additional offers to purchase the property while the property is subject to a contract for sale;

(B) To present all offers to and from the seller in a timely manner regardless of whether the property is subject to a contract for sale;

(C) To disclose to the seller adverse material facts actually known by the licensee;

(D) To counsel the seller as to any material benefits or risks of a transaction which are actually known by the licensee;

(E) To advise the seller to obtain expert advice as to material matters about which the licensee knows but the specifics of which are beyond the expertise of the licensee;

(F) To account in a timely manner for all money and property received; and

(G) To inform the seller that the seller may be vicariously liable for the acts of the seller's agent or seller's subagent that are approved, directed or ratified by the seller.

(iv) To comply with all requirements of this article; and

(v) To comply with any applicable federal, state or local laws, rules, regulations or ordinances.

(b) The following information shall not be disclosed by a licensee acting as a seller's agent without the informed consent of the seller:

(i) That a seller is willing to accept less than the asking price for the property;

(ii) What the motivating factors are for the party selling the property;

(iii) That the seller will agree to financing terms other than those offered;

(iv) Any material information about the seller unless disclosure is required

by law or failure to disclose the information would constitute fraud or dishonest dealing.

(c) *A licensee acting as a seller's agent owes no duty or obligation to the buyer, except that a licensee shall disclose to any prospective buyer all adverse material facts actually known by the licensee. The adverse material facts may include adverse material facts pertaining to the title and the physical condition of the property, any material defects in the property and any environmental hazards affecting the property which are required by law to be disclosed. The licensee acting as a seller's agent shall not perpetuate a material misrepresentation of the seller which the licensee knows or should know is false.*

(d) *A seller's agent owes no duty to conduct an independent inspection of the property for the benefit of the buyer and owes no duty to independently verify the accuracy or completeness of any statement made by the seller or any independent inspector.*

(e) A seller's agent may show alternative properties not owned by the seller to prospective buyers and may list competing properties for sale and not be deemed to have breached any duty or obligation to the seller.

(f) A seller may agree in writing with a seller's agent to extend an offer of subagency to other brokers to cooperate in selling the property.

(g) Any broker acting as a subagent on the seller's behalf shall have the obligations and responsibilities set forth in subsections (a) through (e) of this section. [Emphasis added.]

[¶ 17] An "agent engaged by buyer," has these duties and obligations according to § 33–28–304:

(a) A licensee engaged by a buyer to act as a buyer's agent shall have the following duties and obligations:

(i) To perform the terms of the written agreement made with the buyer;

(ii) To exercise reasonable skill and care for the buyer;

(iii) To promote the interests of the buyer with the utmost good faith, loyalty and fidelity, including:

(A) To seek a price and terms which are acceptable to the buyer, except that the licensee shall not be obligated to seek other properties while the buyer is a party to a contract to purchase property;

(B) To present all offers to and from the buyer in a timely manner regardless of whether the buyer is already a party to a contract to purchase property;

(C) *To disclose to the buyer adverse material facts actually known by the licensee;*

(D) To counsel the buyer as to any material benefits or risks of a transaction which are actually known by the licensee;

(E) To advise the buyer to obtain expert advice as to material matters about which the licensee knows but the specifics of which are beyond the expertise of the licensee;

(F) To account in a timely manner for all money and property received; and

(G) To inform the buyer that the buyer may be vicariously liable for the acts of the buyer's agent that are approved, directed or ratified by the buyer.

(iv) To comply with all requirements of this article; and

(v) To comply with any applicable federal, state or local laws, rules, regulations or ordinances.

(b) The following information shall not be disclosed by a licensee acting as a buyer's agent without the informed consent of the buyer:

(i) That a buyer is willing to pay more than the purchase price for the property;

(ii) What the motivating factors are for the party buying the property;

(iii) That the buyer will agree to financing terms other than those offered;

(iv) Any material information about the buyer unless disclosure is required by law or failure to disclose the information would constitute fraud or dishonest dealing.

(c) A licensee acting as a buyer's agent owes no duty or obligation to the seller, except that a licensee acting as a buyer's agent shall not make any material misrepresentation or fraudulent misrepresentation regarding an adverse material fact actually known by the licensee.

(d) *A buyer's agent* owes no duty to conduct an independent investigation of the buyer's financial condition and *owes no duty to independently verify the accuracy or completeness of statements made by the buyer or any independent inspector.*

(e) A buyer's agent may show properties in which the buyer is interested to other prospective buyers without breaching any duty or obligation to the buyer. Nothing in this section shall be construed to prohibit a buyer's agent from showing competing buyers the same property and from assisting competing buyers in attempting to purchase or lease a particular property. [Emphasis added.]

[¶ 18] An "intermediary" shall not act as an advocate or agent for either party and shall be limited to providing those services described below in section (b)(ii) of § 33–28–305:

(a) *A licensee engaged as an intermediary shall not act as an advocate or agent for either party* and shall be limited to providing those services described in subsection (b)(ii) of this section.

(b) A licensee engaged as an intermediary shall owe to each party with whom the intermediary has contracted the following duties and obligations:

(i) To perform the terms of any written agreement made by the intermediary with any party or parties to the transaction, provided that the terms of the written agreement shall be consistent with this article;

(ii) To exercise reasonable skill and care as an intermediary, including:

(A) Presenting all offers and counteroffers in a timely manner regardless of whether the property is subject to a contract for sale;

(B) *Advising the parties to obtain expert advice as to material matters about which the intermediary knows but the specifics of which are beyond the expertise of the intermediary;*

(C) Accounting in a timely manner for all money and property received;

(D) Keeping the parties fully informed regarding the transaction;

(E) Obtaining the written consent of the parties before assisting the buyer and seller in the same real estate transaction;

(F) Assisting the parties in complying with the terms and conditions of any contract which may include closing the transaction;

(G) Disclosing to the parties any interests the intermediary may have which are adverse to the interest of either party;

(H) *Disclosing to all prospective buyers any adverse material facts actually known by the intermediary, including but not limited to adverse material facts pertaining to the title, the physical condition of the property, any defects in the property and any environmental hazards affecting the property required by law to be disclosed;*

(J) Disclosing to any prospective seller all adverse material facts actually known by the intermediary, including but not limited to adverse material facts pertaining to the buyer's financial ability to perform the terms of the transaction and the buyer's intent to occupy the property as a principal residence; and

(K) *Disclosing to the parties that an intermediary owes no fiduciary duty either to buyer or seller, is not allowed to negotiate on behalf of the buyer or seller, may be required to disclose information he learns about a property to the other party, and may be prohibited from disclosing information about the other party which if*

*known could materially affect negotiations in the real estate transaction.*

(iii) To comply with all requirements of this article; and

(iv) To comply with any applicable federal, state or local laws, rules, regulations or ordinances.

(c) The following information shall not be disclosed by an intermediary without the informed consent of all parties:

(i) That a buyer is willing to pay more than the purchase price offered for the property;

(ii) That a seller is willing to accept less than the asking price for the property;

(iii) What the motivating factors are for any party buying or selling the property; or

(iv) That a seller or buyer will agree to financing terms other than those offered.

(d) *An intermediary has no duty to conduct an independent inspection of the property for the benefit of the buyer and has no duty to independently verify the accuracy or completeness of statements made by the seller, or independent inspectors.*

(e) An intermediary has no duty to conduct an independent investigation of the buyer's financial condition or to verify the accuracy or completeness of any statement made by the buyer.

(f) An intermediary may do the following without breaching any obligation or responsibility:

(i) Show alternative properties not owned by the seller to a prospective buyer;

(ii) List competing properties for sale or lease;

(iii) Show properties in which the buyer is interested to other prospective buyers; and

(iv) Serve as an agent, subagent or intermediary for the same or for different parties in other real estate transactions.

(g) An intermediary may cooperate with other brokers but shall not engage any subagents. [Emphasis added.]

[¶ 19] In *Hulse I,* ¶¶ 51–62, 33 P.3d at 138–41, we clarified the duties owed by real estate professionals to clients:

The Hulses appeal the district court's grant of summary judgment for the defendant BHJ, Inc., a licensed real estate brokerage, for the acts of its agent Amory Hubbard on claims they label negligent misrepresentation and fraud. We take this opportunity to clarify the duties owed by licensed real estate brokers, agents, and salespersons and the causes of action that may arise as a result of an alleged breach of those duties.

The Hulses assert a claim of negligent misrepresentation against defendant BHJ, Inc. citing Restatement (Second) Torts § 552. In *Richey v. Patrick,* a case involving claims by purchasers of real property against lay sellers, we discussed the tort of negligent misrepresentation as found in the Restatement and stated that in order for there to have been a negligent misrepresentation, the plaintiff must show that

[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Richey v. Patrick,* 904 P.2d 798, 802 (Wyo. 1995).

In *Richey,* we found that the sellers had not "supplied false information," as required by the claim, because the sellers had not supplied **any** information to the purchasers. We said, "[a] nondisclosure of information cannot support a claim of misrepresentation; since nothing has been represented, an essential element of the claim is missing." *Id.* at 802 (citing *Burman v. Richmond Homes, Ltd.,* 821 P.2d 913, 919 (Colo.App.1991)). We went on to hold that the crux of the purchasers' com-

plaint was that the sellers should have informed them of a material fact, they owed a duty to do so, and it was this nondisclosure that caused the plaintiff's damage. In *Richey,* we then clarified that the appropriate claim was one for negligent nondisclosure as found within *Restatement (Second) Torts* § 551. However, we declined to apply the *Restatement* section to the plaintiffs' claim because we reasoned that the "as is" clause contained within the purchase contract signed by the sellers and purchasers placed the risk of discovery of adverse material facts upon purchasers of real estate. Thus, we recognized the relationship between the parties was essentially contractual and held that when a contract places the burden on the purchaser to discover defects, they are barred from seeking relief for negligent nondisclosure. [Emphasis in original.]

Likewise, in our recent case of *Snyder v. Lovercheck,* we addressed as an issue of first impression whether a purchaser of realty could even bring a claim of negligent misrepresentation, a tort action, against a seller when the relationship between the parties arises in contract. Again, we held that the contractual relationship is controlling. When purchasers of realty sign contracts with disclaimers and merger clauses stating that the purchaser is not relying on the representations of the sellers or their agents as to the condition of the property, the contract has allocated the risks of loss resulting from the purchaser's reliance on the seller's representations to the purchaser. In reasoning to our ultimate conclusion, this court had an extended discussion of the distinction between duties arising by tort and those arising by contract. We said:

> Tort law proceeds from a long historical evolution of externally imposed duties and liabilities. Contract law proceeds from an even longer historical evolution of bargained-for duties and liabilities. The careless and unnecessary blanket confusion of tort and contract would undermine the carefully evolved utility of both.
>
> In tort, the legislatures and the courts have set the parameters of social policy and imposed them on individual members of society without their consent. The social policy in the field of contract has been left to the parties themselves to determine, with judicial and legislative intervention tolerated only in the most extreme cases. Where there has been intervention, it has been by the application of well established contract doctrines, most of which focus on threats to the integrity of the bargaining process itself such as fraud or extreme imbalance in bargaining power.

*Snyder v. Lovercheck,* 992 P.2d at 1087.

As illustrated by our holdings in *Richey* and *Snyder,* this court continues to value the freedom to contract between sellers and purchasers of realty. We recognize that the parties to the contract may allocate the risks of loss as they so choose. Having done so, absent proof of fraud, we generally allow the unambiguous language found in the parties' contract to control the scope of subsequent litigation. We have been exceedingly reluctant to introduce tort principles into claims that are essentially contract actions.

However, this court's jurisprudence reflects that the inverse rule is likewise valid. Contract principles that govern the parties to a contract are not controlling on claims against nonparty professionals whose duties arise in tort. Our precedents reveal a recognition that tort duties and liabilities imposed by the legislatures and courts are supported by underlying social policies which require the imposition of obligations on a defendant to act reasonably for the protection of a plaintiff. By imposing tort duties, courts and legislatures have externally allocated the risks arising from certain relationships for the protection of the public. Having done so, individual parties are limited in shifting those burdens from the obligor to the obligee by private action.

At this point in time, there can be no doubt that licensed professional real estate agents and brokers are a class of persons on whom the law has imposed affirmative tort duties. Two decades ago this court stated in *Hagar v. Mobley:*

Real estate brokers and salesmen are licensed by the State of Wyoming and required to meet high standards of honesty, integrity, trustworthiness and competency. Theirs is a regulated profession. Failure to satisfy those standards is ground for suspension or revocation of a real estate broker's or salesperson's license. An act licensing real estate agents must be construed in the light of an obvious purpose of protecting the public in the handling of important and valuable transactions relating to real property. **As a result, such an agent does not stand in the same shoes of a lay vendor.** Such realtors owe the vendee the same duties of integrity owed the public at large. They must be honest, trustworthy and competent. [Emphasis in original.]

*Hagar v. Mobley,* 638 P.2d 127, 136 (Wyo. 1981) (emphasis added and citation omitted). In *Hagar,* we cited with approval the reasoning of the Utah Supreme Court reversing the dismissal of a claim against a realtor:

In this state, it is apparent that the rule of caveat emptor does not apply to those dealing with a licensed real estate agent. Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public.

*Hagar,* 638 P.2d at 137 (quoting *Dugan v. Jones,* 615 P.2d 1239, 1248 (Utah 1980)).

Furthermore, we cited with approval the Montana Supreme Court's then recent holding that real estate brokers have, like other professionals, certain standards of care which must be satisfied. We said that the Montana court observed that the failure to maintain those standards of skill, competency, and integrity exposes realtors to, in effect malpractice actions. *Hagar,* 638 P.2d at 137 (citing *McCarty v. Lincoln Green, Inc.,* 190 Mont. 306, 620 P.2d 1221, 1225 (1980)). This court went on to state that we may exact a high standard of care from realtors and held that the standard of

care for realtors may be adopted by the court from a legislative enactment. *Id.* (citing *Distad v. Cubin,* 633 P.2d 167 (Wyo. 1981)). We reiterated:

Realtors, just like doctors, lawyers, engineering consultants, and builders, hold themselves out as professionals; it is their job to know their profession. People rely on and trust them. Failure to comply with either the accepted standards in the field or the standards society is willing to recognize as acceptable, is actionable.

*Hagar,* 638 P.2d at 138. As to the question of damages, we held "[t]he liability of real estate agents, brokers and salespersons, as in all actions predicated upon the failure to perform some duty, sounds in tort. In tort cases damages are generally awarded in order to compensate claimants for loss. The measure of damages is the amount which will compensate for all the detriment proximately caused by the breach of duty." *Hagar,* at 139.

Subsequent to our holding in *Hagar,* parties have apparently seized on the language within the opinion stating the duty of care as *"the broker is liable because of material representations of the principal if he repeats them and knows, or reasonably should know, of their falsity. Liability attaches in this context on grounds of negligence,"* *id.* at 137, and have asserted claims labeled "negligent misrepresentation" against both lay sellers and real estate brokers and agents. "Negligent misrepresentation" and "negligent nondisclosure" are generic tort actions found within the *Restatement (Second) Torts* §§ 552 and 551 respectively. These torts have specific elements and, as previously discussed, this court has addressed in various opinions whether to adopt and apply them to claims brought by plaintiffs against sellers of realty and real estate brokers and agents. See *Richey v. Patrick,* 904 P.2d 798 (Wyo.1995); *Snyder v. Lovercheck,* 992 P.2d 1079 (Wyo.1999); *Sundown, Inc. v. Pearson Real Estate Co., Inc.,* 8 P.3d 324 (Wyo.2000). We have also addressed the effect of various exculpatory clauses on the above causes of action. At this juncture, we reaffirm all

prior holdings and precedent as applied to lay vendors/sellers of real property and their agents or subagents, who **are not** licensed real estate professionals. [Emphasis in original.]

However, notwithstanding any subsequent confusion in formulating, titling, or deciding tort claims against licensed real estate professionals premised upon their duties imposed by statute, it is abundantly clear that *Hagar* contemplated that the claim was one of professional negligence. This is the holding that we expressly reaffirm by this decision. It is further supported by legislative enactments in 1997 by which the Wyoming Legislature essentially codified the court's holding in *Hagar* and went further to expand and clarify the duty of care owed by real estate professionals to parties when acting as seller's, buyer's or intermediary agents. See Wyo. Stat. § 33–28–303 (LexisNexis 2001) *Seller's agent engaged by seller;* Wyo. Stat. § 33–28–304 (LexisNexis 2001) *Agent engaged by buyer;* Wyo. Stat. Ann. § 33–28–305 (LexisNexis 2001) *Intermediary.* The Wyoming Legislature in 2000 adopted Wyo. Stat. § 33–28–124 *Act, error or omission in the rendering of real estate services,* which provides: ***"A cause of action arising from an act, error or omission in the rendering of services provided by a licensee under this act shall be brought within the time limits provided under W.S. 1–3–107." Wyo. Stat. Ann. § 1–3–107 is the statute of limitations for claims of professional negligence. It is applicable to claims arising after the effective date of Wyo. Stat. Ann. § 33–28–124.*** (FN9) [Emphasis added.]

As we held in *Hagar,* the court may adopt from legislative enactment a standard of care for realtors. *Id.,* 638 P.2d at 137. Wyo. Stat. § 33–28–303(c) provides:

"A broker acting as a seller's agent owes no duty or obligation to the buyer, except that a broker shall disclose to any prospective buyer all adverse material facts actually known by the broker. The adverse material facts may include adverse material facts pertaining to the title and the physical condition of the property, any material defects in the property and any environmental hazards affecting the property which are required by law to be disclosed. The broker acting as a seller's agent shall not perpetuate a material misrepresentation of the seller which the broker knows or should know is false." (FN10)

In *Hagar* we said that the facts necessary to be disclosed are those that are "pivotal to the transaction from the buyer's perspective." *Id.* at 138 (quoting *Tennant v. Lawton,* 26 Wash.App. 701, 615 P.2d 1305, 1309–1310 (1980)).

Having hereby outlined what law is applicable to the liability of real estate brokers and salespersons, we note that the claims asserted by the plaintiffs, while labeled "negligent misrepresentation," essentially assert a breach of the duty of care owed by real estate professionals to non-client buyers. However, as a reviewing court, we are not fact finders in the first instance. The district court's grant of summary judgment did not address the issue of whether BHJ, Inc.'s agent, Hubbard, exercised such care, skill, and diligence as others who are engaged in the profession would ordinarily exercise under similar circumstances in fulfilling the duties imposed upon him by statute. We, therefore, vacate the district court's grant of summary judgment to BHJ, Inc. on the issue of "negligent misrepresentation" and remand for a determination under the applicable standard consistent with the law we have herein set out.

Also see *Hulse II,* ¶¶ 8–13, 71 P.3d at 264–69; Sam A. Mackie, *Real–Estate Broker's Misrepresentation or Nondisclosure as to Condition or Value of Realty,* 39 Am.Jur. POF3d 309 (1996 and Supp.2009).

[¶ 20] With respect to the appeal in Case No. S–08–0250, the district court found that the Throckmartins signed a "Real Estate Brokerage Disclosure" that informed them of Hove's and TOP's role in this real estate transaction and fulfilled the requirements of § 33–28–306. Likewise the "Contract to Buy and Sell Real Estate" also disclosed to the Throckmartins that TOP Realty was working with the buyer as an "interme-

diary." In addition, the contract assigned the buyers the responsibility for ascertaining the actual condition of the property, as well as making it clear that buyers could not rely on any representation made by sellers or sellers' agents as to the condition of the property, as well as the responsibility for obtaining inspections, including structural inspections. The district court determined that, based on the above cited documentation, Hove would be treated as an "intermediary" and held to that standard. As an intermediary, Hove was required to disclose to the Throckmartins any adverse material facts *actually known* to her. § 33–28–305(b)(ii)(H). The Throckmartins received and signed for a copy of the sellers' disclosure statement which revealed there were problems with the home's foundation. Hove had not yet been into the house at the time the contract was signed by the Throckmartins.

[¶ 21] For purposes of the summary judgment motion (and only for that purpose), the district court assumed it to be true that the foundation of the home the Throckmartins purchased was damaged, and that Neether and Neether–Oedekoven concealed the structural defects behind false walls and cabinets as alleged by the Throckmartins.

■ [¶ 22] However, the Throckmartins were unable to come forward with any facts that suggested that the adverse material facts at issue here were "actually known" to Hove. The Throckmartins rely heavily on Hove's failure to provide the inspector she hired, on behalf of the Throckmartins, a copy of the owner's disclosure statement. Indeed, during their depositions, the Throckmartins repeatedly admitted the sole basis of their contention that Hove "actually knew" of the defects, was that as a real estate professional, working in Gillette, she should have known, and had a duty to know, about the problems associated with homes in the neighborhood where the subject real estate was located. Thus, the record is devoid of a genuine issue of material fact as to whether Hove breached her duties as an "Intermediary" or that she otherwise breached the terms of the contract between Hove and the Throckmartins. The district court applied this same reasoning to § 33–28–302(g) (**Every contract, duty or relationship within this article, including intermediary or customer relationships, imposes an obligation of good faith and fair dealing in its performance or enforcement.**), i.e., that the Throckmartins had failed to come forward with any "genuine issue of material fact" which pointed to Hove's violation of those implied covenants. Once again, the only contention the Throckmartins brought to the fore was that, as a real estate agent in Gillette, she had a duty to know the "actual condition" of all properties she sold to buyers. Hove denied having any actual knowledge of the problems with the house at issue, and the Throckmartins have not pointed us to any pertinent authority that Hove had a duty to be aware of the condition of the properties she showed to buyers. Although the principle of caveat emptor has been blunted in the arena of real estate by case law and statute, the primary responsibility for obtaining adequate inspections of newly purchased homes falls on the buyer, and the record on appeal will not support a factual finding that Hove did anything to frustrate, discourage, or impede the Throckmartins' full right to have complete inspections done on the home they decided to purchase. The Throckmartins contend they did plead professional negligence and that the district court simply overlooked that claim. Our review of the record establishes that no such claim was explicitly made and, furthermore, to the extent it was implicit in the pleadings, the district court implicitly granted summary judgment in that regard as well. Based on our review of the record and the governing law, we conclude the district court was correct in determining that there were no genuine issues of material fact in this matter, and that Hove and TOP were entitled to judgment as a matter of law.

[¶ 23] With respect to Case No. S–08–0269, the district court's reasoning is somewhat different because the business relationship between the Throckmartins, and Nelson and Re/Max, was different from the business relationship described immediately above in Case No. S–08–0250. The district court identified the Throckmartins' claims against Nelson and Re/Max as follows: breach of

contract; that Nelson is subject to censure, probation, suspension or revocation of her license and a fine for violating provisions of § 33–28–111 (and, hence, guilty of professional negligence); fraudulent concealment; and breach of the covenant of good faith and fair dealing.

[¶ 24] The district court then enumerated what it considered the undisputed facts. In the "Exclusive Right to Sell Listing Contract Intermediary (Residential)" Nelson is identified as an "intermediary." In the "Contract to Buy and Sell Real Estate (Residential)" Re/Max is identified as an "intermediary." As noted above, buyers were cautioned that they could not rely on representations made by the seller or seller's agents as to the condition of the property. Moreover, neither Nelson nor Re/Max had entered into a contractual relationship with the Throckmartins. For purposes of the summary judgment motion (and only for that purpose), the district court once again assumed it to be true that the foundation of the home the Throckmartins purchased was damaged and that Neether and Neether–Oedekoven concealed the structural defects behind false walls and cabinets as alleged by the Throckmartins.

[¶ 25] Continuing its reasoning process concerning breach of contract, the district court noted that a contract can be express or implied. An implied in fact contract may arise where parties act in a manner conveying mutual agreement and an intent to promise. However, there are neither express nor implied duties imposed on Nelson or Re/Max by mutual agreement and, as a result, this cause of action fails. See *Birt v. Wells Fargo Home Mortgage, Inc.*, 2003 WY 102, ¶¶ 15–20, 75 P.3d 640, 649–50 (Wyo. 2003).

[¶ 26] The district court noted that the Throckmartins contended that Nelson and Re/Max owed them a duty to fully disclose material facts and to affirmatively verify the truth of information or to investigate the property. Furthermore, they contended this duty was breached and, as a result, they suffered pecuniary damages. These contentions amount to a claim for negligent nondisclosure and negligent misrepresentation. See *Hulse I*, ¶ 48, 33 P.3d at 137.

A cause of action for negligent nondisclosure is not recognized in Wyoming. *Sundown, Inc. v. Pearson Real Estate Co.*, 8 P.3d 324, 331–32 (Wyo.2000). Continuing, the district court noted that the Throckmartins did not assert that Nelson and Re/Max affirmatively supplied false information. Rather, they assert that Nelson and Re/Max failed to fully disclose all material facts, or to take reasonable steps to avoid the misrepresentations made by the Neethers. However, alleged nondisclosure would not give rise to negligent misrepresentation, because "a nondisclosure of information cannot support a claim of misrepresentation, since nothing has been represented or misrepresented. An essential element of the claim is missing." See *Hulse I*, ¶ 53, 33 P.3d at 138. Alternatively, the Throckmartins are barred from bringing a cause of action for negligent misrepresentation because they signed the contract which contained a disclaimer to the effect that they were not relying on any representations made by Nelson and/or Re/Max. *Id.*, ¶ 63, 33 P.3d at 141. In wrapping up its discussion of the Throckmartins' § 33–28–111 claims, the district court noted that an intermediary in Wyoming

> ... has no duty to conduct an independent inspection of the property for the benefit of the buyer and has no duty to independently verify the accuracy or completeness of statements made by the seller, or independent inspectors.

Wyo. Stat. Ann. § 33–28–305(d).

[¶ 27] The district court addressed the Throckmartins' claims of fraudulent concealment, noting the rule that fraud must be established by clear, unequivocal, and convincing evidence, and that it will never be presumed. That rule applies to a motion for summary judgment. Thus, assuming the party accused of fraud has presented facts that refute the allegation of fraud, the nonmoving party relying on a fraud claim must demonstrate the existence of genuine issues of material facts by clear, unequivocal, and convincing evidence. *McKenney v. Pacific First Federal Savings Bank of Tacoma, Wash.*, 887 P.2d 927, 929 (Wyo.1994). Fraudulent concealment requires scienter, which refers to the knowl-

edge of the facts being concealed. This Court has expressly held that one cannot be guilty of fraudulently or intentionally concealing or misrepresenting facts of which he is not aware. *Meeker v. Lanham,* 604 P.2d 556, 559 (Wyo.1979). Nelson's testimony of her lack of actual knowledge of the defects sufficiently refutes the allegations of fraudulent concealment. Moreover, even affording the Throckmartins the most generous inferences from the information contained in the record, the district court opined, those facts (assumed to be true), at most give rise only to the inference that Nelson should have known of the foundation defects—"should have known" is far different from what she actually knew. Throckmartins have not demonstrated the existence of a genuine issue of material fact as to Nelson's actual knowledge of the defects by clear, unequivocal, and convincing evidence.

[¶ 28] With respect to the asserted breach of the covenant of good faith and fair dealing which is implied in all contracts, the facts extant can lead only to the conclusion that there was no contract between Nelson and Re/Max and the Throckmartins. Without a contract, there is no basis for imposition of the implied covenant, whether in contract or in tort, because either cause of action arises out of the contractual relationship. *Birt,* ¶ 21, 75 P.3d at 650. We conclude that the district court was correct in determining that there were no genuine issues of material fact and that Nelson and Re/Max were entitled to judgment as a matter of law.

## CONCLUSION

[¶ 29] The district court's summary judgment orders are affirmed as to both cases discussed above.