2009 WY 84

**Deborah McGARVEY, Appellant (Plaintiff),**

v.

**KEY PROPERTY MANAGEMENT LLC, and Bicentennial Village Associates LLC, Appellees (Defendants).**

No. S–08–0194.

Supreme Court of Wyoming.

July 1, 2009.

Representing Appellant: Timothy Kingston, Graves, Miller & Kingston, PC, Cheyenne, Wyoming.

Representing Appellees: Kathleen Dixon and Patrick Dixon, Chapin & Dixon, LLP, Casper, Wyoming. Argument by Mr. Dixon.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Deborah McGarvey filed a wrongful termination suit against her employer, claiming that she was discharged from her job for reasons that violate public policy. The dis-

trict court granted summary judgment for the employers, ruling that Ms. McGarvey had not presented facts necessary to sustain her cause of action. Ms. McGarvey challenges that decision. We will affirm.

### ISSUES

[¶ 2] Ms. McGarvey states these issues:

1. Does or should Wyoming recognize a "free speech" exception to the at-will employment doctrine?
2. Was the Appellant fired in violation of her right to free speech?
3. Did the lower court commit reversible error when it held that the Appellant's free speech claim was barred because her speech had the potential to cause economic harm to her employer?

### FACTS

[¶ 3] Bicentennial Village Associates LLC is a non-profit affordable housing organization. It owned a housing complex in Rock Springs, Wyoming, that provided housing to low-income residents, particularly elderly and disabled persons. Key Property Management LLC acted as the management company for the property. Ms. McGarvey worked as a manager at the housing complex.[1]

[¶ 4] While planning renovations to the facility in 2004 and early 2005, company representatives met with residents and staff to discuss the renovations. The Mayor of Rock Springs also attended. Company representatives provided assurances that the renovation would cause minimal disruptions. In particular, Ms. McGarvey recalled company representatives stating that interference with the residents' daily lives would be avoided, that no one would be displaced overnight from any apartment, and that residents' personal property would be safeguarded during the renovations. In addition, company representatives reportedly stated that no one currently living in the housing complex would be forced to move because of changes to the low-income qualifications for the facility.

[¶ 5] The renovations began in the spring of 2005, and according to Ms. McGarvey, they did not proceed smoothly. Delays and other problems displaced some residents from their apartments overnight. Crews did not complete work on one apartment before beginning work on the next, making it difficult or impossible for residents to use their apartments. Some residents' personal possessions were left unguarded outside the building. Work crews left used appliances, construction debris, and trash at the site, raising Ms. McGarvey's concerns about the safety of the residents. In addition, Ms. McGarvey learned that some residents might not meet the low-income qualifications and requirements, and could be forced to move from the facility.

[¶ 6] Ms. McGarvey related that she brought these problems and concerns to the attention of company representatives several times over a period of several months, but that she was unsuccessful in effecting any improvements or changes. One day, "on the spur of the moment," she decided to organize a meeting in which residents could bring their problems to the attention of the Mayor of Rock Springs. This meeting took place at the housing complex during regular business hours, and Ms. McGarvey and several residents explained their problems and concerns to the Mayor. According to both Ms. McGarvey and the Mayor, as a result of the meeting and follow-up actions, many of the concerns and problems were eliminated or alleviated.

[¶ 7] Ms. McGarvey maintains that her motive in organizing this meeting was to assist and protect the residents of the housing complex. Because we are reviewing a grant of summary judgment against Ms. McGarvey, we consider the facts in a light most favorable to her position. *See infra* ¶ 10. At the same time, we cannot ignore undisputed facts just because they are less favorable to her position. It is undisputed that Ms. McGarvey did not inform her employers of the meeting or invite them to attend. They were not afforded an opportu-

---

1. The record is confusing about whether Key or Bicentennial Village was Ms. McGarvey's employer. Because it is not material to this deci-

sion, we will refer generally to Ms. McGarvey's "employers" without distinguishing between the two companies.

nity to respond to or defend themselves from the accusations the residents and Ms. McGarvey presented to the Mayor. Because the housing complex received tax credits and other government benefits for serving low-income residents, it was important for the employers to maintain good relations with local government officials. Ms. McGarvey was aware of that fact. Yet during the meeting with the Mayor, Ms. McGarvey either stated, or agreed with the statement, that her employers had lied to the Mayor. As Ms. McGarvey has admitted, she knew that the meeting she organized and the discussions that occurred were potentially harmful to her employers and their legitimate business interests.

[¶ 8] Shortly after the meeting, Ms. McGarvey received an "Employee Warning Notice" from her supervisor, stating that she had held an "unauthorized tenant meeting" that she knew "would be harmful to the company." Several days later, Ms. McGarvey was fired. She claimed that she was discharged because of her meeting with the residents and the Mayor, because of what she had said at that meeting, and because she had "undermined" the interests of her employers.

[¶ 9] Her employers maintained that there were other legitimate reasons for their decision to terminate Ms. McGarvey's employment. They contend that, despite their instructions, she failed or was unable to complete the forms needed to qualify residents to continue living in the low-income housing facility. In addition, Ms. McGarvey's son had been hired to perform maintenance work at the facility. Some people complained about the son's work habits, and during one visit to the apartment complex, a representative of the employers observed that the son was not working while he was on duty. The employers instructed Ms. McGarvey to discharge her son. She did not do so, but the next day, organized the meeting with residents and the Mayor. · Again, however, our standard of review requires us to view the evidence in Ms. McGarvey's favor, and at this point we accept her allegations that she was discharged solely based on the meeting with residents and the Mayor. Even based on these allegations, however, the district court ruled that she had not established facts sufficient to sustain her cause of action, and granted summary judgment against her. She has appealed that decision.

## STANDARD OF REVIEW

[¶ 10] Our review of a district court's decision to grant summary judgment follows a familiar course:

> When a motion for summary judgment is before the supreme court, we have exactly the same duty as the district judge; and, if there is a complete record before us, we have exactly the same material as did he. We must follow the same standards. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.

*Nowotny v. L & B Contract Indus.*, 933 P.2d 452, 455 (Wyo.1997).

## DISCUSSION

[¶ 11] Ms. McGarvey and her employers agree that she was an at-will employee. Wyoming has long adhered to the employment-at-will doctrine, under which "employment for an indefinite period may be terminated by either party at any time and for any reason without incurring liability." *Rompf v. John Q. Hammons Hotels*, 685 P.2d 25, 27 (Wyo.1984). There are, however, exceptions to the employment-at-will doctrine. In particular, we have recognized that an employer may incur tort liability if it discharges an employee for reasons that violate public policy. This exception has been recognized because "allowing [such] a discharge to go unredressed would leave a valuable social policy to go unvindicated." *Allen v. Safeway Stores Inc.*, 699 P.2d 277, 284 (Wyo.1985).

[¶ 12] The district court accurately observed that this exception applies only in "rare" cases.

> As our previous jurisprudence has shown, this Court has steadfastly resisted judicially creating any exceptions to the doctrine of · at-will employment in this state.... We have recognized a limited exception to the at-will employment doctrine to the extent that an employee may not be terminated for a reason that violates public policy. This public policy exception is narrow in scope to avoid unreasonably eliminating employer discretion in terminating at-will employees.

*McLean v. Hyland Enterprises, Inc.*, 2001 WY 111, ¶¶ 22–23, 34 P.3d 1262, 1268 (Wyo. 2001). The narrow scope of the public policy exception is illustrated by the fact that, to date, there has been only one case in which this Court concluded that an employee could maintain a claim of wrongful termination in violation of public policy. *Griess v. Consolidated Freightways Corp.*, 776 P.2d 752, 754 (Wyo.1989) (discharge for exercising the right to seek workers' compensation benefits).

[¶ 13] Given our previous jurisprudence, it is apparent that Ms. McGarvey faced a daunting task when she urged the district court to recognize a public policy exception for an employee who is discharged for exercising rights of free speech. A person alleging that her employment was terminated in violation of public policy must satisfy two requirements in order to maintain a wrongful discharge claim. She must demonstrate that: "(1) The discharge violated a well established public policy; and (2) there is no other remedy available to protect the interests of the discharged employee or society." *Boone v. Frontier Refining, Inc.*, 987 P.2d 681, 688 (Wyo.1999).

[¶ 14] Ms. McGarvey argues that freedom of speech is an important and cherished policy both in Wyoming and throughout the United States. We do not dispute the importance of free speech. The precise question before us, however, is not whether the termination of Ms. McGarvey's employment violated an important public policy, but whether the facts of this case, viewed in a light favorable to Ms. McGarvey, demonstrate the violation of a well-established public policy. For several reasons, Ms. McGarvey has not met this requirement. · ·

[¶ 15] Freedom of speech is protected at the federal level under the First Amendment to the United States Constitution, which provides in pertinent part that "Congress shall make no law ... abridging the freedom of speech." Because this prohibition is leveled against Congress, it "only protects against the abridgement of constitutional rights by a governmental entity and has no application when the defendant is a private party." An employer who is "neither a federal nor a state actor ... cannot be sued for violating the plaintiff['s] First Amendment rights of free expression." *Drake v. Cheyenne Newspapers, Inc.*, 842 F.Supp. 1403, 1405–06 (D.Wyo.1994). It is undisputed that Ms. McGarvey's employers are not federal or state actors. As private entities, they cannot be held liable under the federal constitution for violating an employee's federal rights to free speech. Ms. McGarvey cannot demonstrate that her discharge violated any well-established public policy based on the federal constitution.

[¶ 16] Ms. McGarvey points out that the free speech provision of the Wyoming Constitution is worded differently. Article 1, Section 20 of the Wyoming Constitution provides, in part, that "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Unlike the First Amendment to the federal constitution, the Wyoming free speech provision is not explicitly limited in application to governmental entities. Based on this ambiguity, Ms. McGarvey asserts that the Wyoming Constitution should be interpreted differently from the federal constitution, and should be recognized as protecting rights of free speech against abridgement by both private and public entities.

[¶ 17] Ms. McGarvey emphasizes that there are no Wyoming cases rejecting the proposition that the Wyoming Constitution's free speech protections apply to private entities. However, there are also no Wyoming cases explicitly endorsing the proposition.

Ms. McGarvey interprets two Wyoming cases, *Allen,* 699 P.2d 277, and *Drake v. Cheyenne Newspapers, Inc.,* 891 P.2d 80 (Wyo.1995), as impliedly recognizing the possibility that a private employer may be held liable for violating an employee's free speech rights.

[¶ 18] We interpret those two cases differently. In *Allen,* the issue of whether the Wyoming Constitution's free speech provision applies to private parties was never mentioned. In *Drake,* the issue was mentioned, but never resolved. In both cases, we found it unnecessary to determine the precise scope of the Wyoming Constitution because, regardless of whether its free speech provision applied to private parties, there were other reasons that the Allens and Mr. Drake could not maintain their wrongful termination claims. These same reasons apply in Ms. McGarvey's case.

[¶ 19] In *Allen,* we ruled that the Allens could not maintain wrongful termination claims against their employer based on alleged violations of rights to free speech. 699 P.2d at 284. We stated that free speech rights are not without limit, and concluded that the Allens had exceeded the limits of their free speech rights:

> To contend that an employee can talk in a derogatory fashion to customers or business contacts of his employer and be protected from disciplinary action by ... virtue of the right to speak freely is so obviously in error as to need little consideration. The constitutional right to speak freely is not an absolute right.

*Id.* at 283. The Allens had spoken in a derogatory fashion to their employer's business contacts. In discharging the Allens, the employer was "protecting a legitimate business interest in eliminating a cause or potential cause for loss of sales." *Id.* In these circumstances, the Allens' speech was not protected speech under either the federal constitution or the Wyoming Constitution. Their discharge, even if premised on that speech, did not infringe upon their legitimate free speech rights. Their discharge did not violate any well-established public policy, and did not give rise to claims of wrongful termination based on public policy.

██ [¶ 20] The circumstances in the present case match closely with those in *Allen.* Ms. McGarvey contends, with some passion, that she was speaking out in a selfless effort to protect elderly, disabled, and low-income individuals. On the other hand, it is undisputed that it was important to her employers to maintain good working relationships with local government officials, and that Ms. McGarvey was well aware of that fact. Nevertheless, when Ms. McGarvey organized a meeting of disgruntled residents with the Mayor, she did not inform her employers of the meeting or invite their representatives to attend and respond to the residents' concerns and problems. She "expressed her negative opinion of her employer[s] to government officials, knowing that her employer[s'] relationships with the officials would potentially be harmed." Ms. McGarvey admits, as the district court noted, that her actions were not "fair" and were potentially "harmful or hurtful" to her employers. As in *Allen,* Ms. McGarvey's speech under these circumstances exceeded the limits of protected speech. Her discharge because of that speech did not, therefore, violate any well-established public policy.

[¶ 21] In *Drake,* we similarly ruled that Mr. Drake could not maintain a wrongful discharge claim based on the violation of his rights to free speech. We again observed that "the right to free speech is not absolute," and noted that "[o]ne of the restrictions on the right to free speech is that the right does not, generally, extend to private property." 891 P.2d at 82. Mr. Drake's employment was terminated because of communications he made while at work on the employer's private property. Because this was not protected speech, Mr. Drake's discharge did not violate public policy, and he could not maintain a wrongful termination claim against his employer.

[¶ 22] The speech that Ms. McGarvey claims was the reason for her discharge took place in a meeting held during working hours in the offices of her employers' apartment complex. As in Mr. Drake's case, the speech Ms. McGarvey made while at work on her employers' private property was not constitu-

tionally protected. Her discharge, even if based on that speech, did not violate any well-established public policy. Consistent with our precedent, we conclude that the facts presented in Ms. McGarvey's case do not support a claim for wrongful termination in violation of public policy.

[¶ 23]   The district court properly granted summary judgment against Ms. McGarvey, and we affirm the district court's decision.