DAVIS, Chief Justice.
*305 [¶1] Trent Kaufman appeals the district court's grant of summary judgment to Rural Health Development (RHD) on his retaliatory discharge claim. He contends that genuine issues of fact precluded summary judgment and that his claim should proceed to trial. We affirm.
ISSUES
[¶2] Mr. Kaufman presents two issues on appeal, which he states as:
Issue 1: Whether the public policy exception to at-will employment applies to termination of an employee for submitting a report on elder abuse of a resident that was required by statute.
Issue 2: Whether the district court erred in making findings of a disputed material fact precluding summary judgment by accepting the employer's pretext for termination, and finding termination "non-retaliatory" and the Kaufman report "deficient."
FACTS
[¶3] In January 2017, the Platte County Hospital Board of Trustees retained Rural Health Development, Inc. (RHD) to provide nursing home management services at the Platte County Legacy Home. Shane Filipi worked for RHD and served as the nursing home's administrator until May 22, 2017, when RHD hired Trent Kaufman for that position. Mr. Filipi then became RHD's western regional manager and Mr. Kaufman's supervisor.
[¶4] On June 20, 2017, a resident of the nursing home reported to Mr. Kaufman that on June 9, 2017, a physical therapist working at the home threatened her with loss of Medicare benefits and removal from the home unless she agreed to undergo a physical therapy assessment and participate in physical therapy. Mr. Kaufman sent an email to Mr. Filipi describing the resident's concern and asking, "How do you suggest I address the situation?" Mr. Filipi responded:
I'm pretty positive that [the resident] made comments pretty similar in one of her previous stays. I hope I'm thinking of the same resident. After digging into that situation there were two other staff members present that gave different stories than hers that both lined up and contradicted what she said and that she added a lot of drama to her story. I would find out what time this happened and see if there were other staff members around or other residents that are better historians and see what they have to say. Let me know what you find out.
[¶5] The director of nursing spoke with the resident's attending nurse, who essentially confirmed the resident's version of the June 9 incident. The director of nursing instructed the nurse to document the incident using a grievance form, and that was done. Based on this corroborating information, Mr. Filipi, Mr. Kaufman, and the director of nursing all agreed that the incident should be reported to the State as a potential incident of elder abuse. Mr. Filipi also discussed the incident with the vice president of operations for the physical therapist's employer, and she likewise agreed the incident should be reported.[1]
[¶6] Mr. Kaufman began work on the report, and while he was working on it, the director of nursing informed him that Mr. Filipi was on his way to the nursing home and wished to review the report before it was submitted. Mr. Kaufman submitted the report the afternoon of June 20, before Mr. Filipi had an opportunity to review it. The report included a copy of the attending nurse's grievance form as well as cut-and-paste copies of emails exchanged between Mr. Kaufman, Mr. Filipi, and the director of nursing. In the report's closing paragraphs, Mr. Kaufman stated, "It was the consensus of the regional manager, administrator, and director of nursing that this issue should be reported to the State of Wyoming as a potential abuse issue."
[¶7] When Mr. Filipi arrived at the nursing home on June 20, Mr. Kaufman informed him *306 that he had submitted the report and provided him with a hard copy of it. Mr. Filipi was upset that Mr. Kaufman submitted the report without his review. He was also upset that Mr. Kaufman had included in the report the cut-and-paste emails exchanged between the two of them and the director of nursing, that he had not completed the investigation by interviewing the physical therapist before submitting the report, that he did not include a corrective action, and that the report was handwritten rather than typed. Mr. Filipi then told Mr. Kaufman that the two of them would work together to complete the investigation and submit a final report.
[¶8] On June 21 and 22, Mr. Kaufman was out of state for training. On the 22nd, Mr. Filipi was at the nursing home to take care of payroll and accounts payable in Mr. Kaufman's absence. While he was there, several of the home's department heads approached him with concerns about Mr. Kaufman's management of the home. When Mr. Kaufman returned on the 23rd, Mr. Filipi met with him to discuss the concerns that had been brought to his attention, as well as his concerns regarding the submission of the abuse report. During this meeting, Mr. Kaufman asked if he should resign since the department heads had no faith in him. Mr. Filipi told him no, but that Mr. Kaufman needed to think about it.
[¶9] After Mr. Filipi left his office, Mr. Kaufman sent an email to the department heads, stating, "It has been a pleasure working with you all and I will miss working with you all. I am sorry that I did not meet your expectations." A few minutes later, he sent an email to Mr. Filipi that stated, "With a lack of support from the managers and your concerns I am considering this as a 'termination.' " He then left the building.
[¶10] On June 26, 2017, Mr. Filipi and the director of nursing submitted a final report to the State concerning the June 9, 2017 incident. The report was signed by both Mr. Filipi and the director of nursing, and it indicated that the resident's physician and family had been notified and that the long term care ombudsman had been notified.[2] The report summarized the incident, and stated the nursing home's assessment and proposed corrective action as follows (bold typeface in original):
Summary: On the afternoon of 6/9/17 [the resident] was admitted into the facility. [The physical therapist] came in to do an eval with [the resident]. [The resident] did not want to participate in therapy. [The attending nurse] was present in the resident's room for part of the exchange. It is unclear whether [the physical therapist] told [the resident] that she would be kicked out/thrown out/discharged from facility/Medicare if she did not participate in therapy. Both [the resident] and [the physical therapist] apologized to each other the next day. [The resident] agreed to do an eval on the 12th and has been participating in therapy since. [The resident] reported this incident to Administrator Kaufman on the 20th. [The attending nurse] was asked on the 20th about the exchange that took place on the 9th and agreed to fill out a grievance. [The resident] was admitted directly from the ER on the 9th and was already anxious from a fall that took place at her home. [The resident] was sent back later in the night to hospital due to hypoxia.
Administrative Decision based on evidence provided: [The physical therapist] should have taken a different approach and with [the resident's] anxiety and health issues that evening it would have been in everybody's best interests to come back the next day.
Corrective Action taken: [The physical therapist] has been assigned education that will be completed in the next 2 weeks that covers patients' rights/resident rights, resident abuse, and diffusing customer complaints. [The physical therapist's] supervisors will follow up to ensure proper resident interactions. [The attending nurse] will be educated *307 on timely reporting of resident grievances.
[¶11] On September 20, 2017, the State issued a Notice of Conclusions. The notice indicated that the State had completed its investigation and had found the allegation of abuse to be unsubstantiated.
[¶12] On September 25, 2017, Mr. Kaufman filed a complaint against RHD and Mr. Filipi, individually and as regional manager of RFD. The complaint asserted a claim for retaliatory constructive discharge, and in support alleged:
45. Filipi instructed Kaufman that no report of the elder abuse incident should be made.
46. Kaufman understood that Filipi was asking him to either disregard the resident's complaint altogether, or to minimize it in any reports to the State agencies.
* * * *
67. Under federal and state legislation and regulation, elder abuse reporting is mandated, and serves and is an important and well established public policy to protect elderly and susceptible citizens.
68. Kaufman was given the choice to comply with the elder abuse reporting requirements under federal and state law, or to comply with Filipi's instruction not to file an elder abuse report.
69. Kaufman reported to the Wyoming Department of Health and Wyoming Department of Family Services that a vulnerable adult was being or had been abused, neglected, exploited, intimidated, or abandoned.
70. After Kaufman made his report, RHD provided Kaufman with two options as to his employment, to be fired or to resign.
71. Kaufman reasonably believed his discharge was imminent.
72. Kaufman was not given any alternative to resignation.
73. Kaufman understood the only choice he had was to resign, so as to avoid an involuntary termination report on his employment record.
74. Kaufman was not provided any time to make the resignation decision that Filipi required him to make.
75. Kaufman was not permitted to select the effective date of his resignation.
76. Kaufman's resignation was involuntary and required by RHD and Filipi.
77. RHD and Filipi's ultimatum to Kaufman created intolerable working conditions and required Kaufman's resignation on June 23.
78. Kaufman's involuntary and forced resignation on June 23 was a constructive discharge.
79. No legitimate reason existed for RHD's constructive discharge of Kaufman.
80. RHD's explanation to Kaufman for his discharge was pretextual.
81. Kaufman's elder abuse report was the substantial and motivating factor for RHD's constructive discharge of him.
[¶13] RHD answered the complaint, and Mr. Filipi filed a W.R.C.P. 12(b)(6) motion to dismiss the claims against him, which the district court granted. On June 25, 2018, RHD moved for summary judgment, asserting that based on the undisputed evidence, Mr. Kaufman had no claim that RHD retaliated against him for his filing of the elder abuse report. On August 29, 2018, the district court granted RHD's motion, and Mr. Kaufman thereafter filed a timely notice of appeal to this Court.
STANDARD OF REVIEW
[¶14] W.R.C.P. 56 governs summary judgment and imposes obligations on the movant and nonmovant that we have described as follows:
The party requesting summary judgment bears the initial burden of establishing a prima facie case that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law. W.R.C.P. 56(c) ; Throckmartin v. Century 21 Top Realty , 2010 WY 23, ¶ 12, 226 P.3d 793, 798 (Wyo. 2010). Until the movant has made a prima facie showing that there are no genuine issues of material fact, the nonmovant has no obligation to respond to the motion with materials beyond the pleadings. Id .
*308 Once a prima facie showing is made, the burden shifts to the party opposing the motion to present evidence showing that there are genuine issues of material fact. Boehm v. Cody Cntry. Chamber of Commerce , 748 P.2d 704, 710 (Wyo. 1987) (citing England v. Simmons , 728 P.2d 1137, 1140-41 (Wyo. 1986) ). The party opposing the motion must present specific facts; relying on conclusory statements or mere opinion will not satisfy that burden, nor will relying solely upon allegations and pleadings. Boehm , 748 P.2d at 710. However, the facts presented are considered from the vantage point most favorable to the party opposing the motion, and that party is given the benefit of all favorable inferences that may fairly be drawn from the record. [ Union Pacific R. Co. v. ] Caballo Coal Co. , ¶ 12, 246 P.3d [867], 871 [ (Wyo. 2011) ].
Bogdanski v. Budzik , 2018 WY 7, ¶ 18, 408 P.3d 1156, 1160-61 (Wyo. 2018) (quoting Amos v. Lincoln Cty. Sch. Dist. No. 2 , 2015 WY 115, ¶ 15, 359 P.3d 954, 958-59 (Wyo. 2015) ).
[¶15] Our review of a district court's grant of summary judgment is de novo. We have said:
We review a district court's order granting summary judgment de novo and afford no deference to the district court's ruling. Thornock v. PacifiCorp , 2016 WY 93, ¶ 10, 379 P.3d 175, 179 (Wyo. 2016). This Court reviews the same materials and uses the same legal standard as the district court. Id . The record is assessed from the vantage point most favorable to the party opposing the motion ..., and we give a party opposing summary judgment the benefit of all favorable inferences that may fairly be drawn from the record. Id . A material fact is one that would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. Id .
Wyo. Jet Center, LLC v. Jackson Hole Airport Bd. , 2019 WY 6, ¶ 10, 432 P.3d 910, 914 (Wyo. 2019) (quoting Reichert v. Daugherty , 2018 WY 103, ¶ 11, 425 P.3d 990, 994 (Wyo. 2018) ).
DISCUSSION
[¶16] An employer of an at-will employee may terminate that employment "at any time and for any reason without incurring liability." McGarvey v. Key Prop. Mgmt. LLC , 2009 WY 84, ¶ 11, 211 P.3d 503, 506 (Wyo. 2009) (quoting Rompf v. John Q. Hammons Hotels , 685 P.2d 25, 27 (Wyo. 1984) ).[3] Our Court has recognized a limited exception to that rule and has held that an at-will employee may not be discharged for a reason that violates public policy. McLean v. Hyland Enter., Inc. , 2001 WY 111, ¶ 23, 34 P.3d 1262, 1268 (Wyo. 2001). To avoid unreasonably eliminating employer discretion in terminating at-will employees, we apply this exception narrowly, and only in rare cases. McGarvey , ¶ 12, 211 P.3d at 507 (quoting McLean , ¶ 23, 34 P.3d at 1268 ).
[¶17] A party asserting a discharge in violation of public policy must demonstrate that: "(1) The discharge violated a well-established public policy; and (2) there is no other remedy available to protect the interests of the discharged employee or society." McGarvey , ¶ 13, 211 P.3d at 507 (quoting Boone v. Frontier Refining, Inc. , 987 P.2d 681, 688 (Wyo. 1999) ). This Court recently clarified the showing that an employee must make to sustain a claim for retaliatory discharge.
1. The employee must make a prima facie case showing employment, [a public policy-protected action by the employee], ... and consequent termination of employment.
2. After a prima facie case is established, the burden shifts to the employer to rebut the inference that its motives were retaliatory by articulating a legitimate non-retaliatory reason.... The burden is one of production-the employer must raise a genuine issue of fact as to whether it retaliatorily discharged the employee.
3. The employee may then meet its ultimate burden of persuasion by proving directly that the discharge was motivated by [his public policy-protected action] ... or by showing that the employer's proffered *309 explanation is not worthy of credence, i.e., that it is a pretext.
King v. Cowboy Dodge, Inc. , 2015 WY 129, ¶ 19, 357 P.3d 755, 760 (Wyo. 2015) (citing Cardwell v. American Linen Supply , 843 P.2d 596, 599-600 (Wyo. 1992) ).
[¶18] We explained that the term consequent , as articulated in Cardwell , was something of a misnomer, and we clarified that the showing an employee must make in his prima facie case is that his public policy-protected action was a substantial and motivating factor in his discharge. King , ¶ 25, 357 P.3d at 762. However, we also adhered to our holding in Cardwell that "mere proximity in time does not prove the required causal connection." Id . ¶ 30, 357 P.3d at 762 (citing Cardwell , 843 P.2d at 600 ).
Ordinarily the prima facie case must, in the nature of things, be shown by circumstantial evidence, since the employer is not apt to announce retaliation as his motive. Proximity in time between the claim and the firing is a typical beginning-point, coupled with evidence of satisfactory work performance and supervisory evaluations. Any evidence of an actual pattern of retaliatory conduct is, of course, very persuasive.
King , ¶ 19, 357 P.3d at 760 (quoting Cardwell , 843 P.2d at 600 ).
[¶19] Our starting point in a retaliatory discharge analysis would normally be to determine whether the employee has identified an established public policy and a lack of any other remedy for his alleged discharge in violation of the policy. We need not address those questions here, however, because we conclude that Mr. Kaufman failed to present admissible evidence in opposition to RHD's summary judgment motion that would make his required prima facie showing-that his submission of the abuse report was a substantial and motivating factor in his discharge-a triable issue. See Boone v. Frontier Refining, Inc. , 987 P.2d at 688 (bypassing policy question where employee failed to show he was discharged in retaliation for reporting unsafe work condition).
[¶20] Mr. Kaufman alleged in his complaint that his supervisor instructed him that no report of the June 9, 2017 abuse incident should be made, and that he was constructively discharged in retaliation for submitting the report. In moving for summary judgment, RHD presented Mr. Filipi's affidavit, by which he attested that he discussed the June 9 incident with Mr. Kaufman and the director of nursing and expressed his agreement that a report should be made. RHD also presented the report that Mr. Kaufman submitted to the State, in which he stated, "It was the consensus of the regional manager, administrator, and director of nursing that this issue should be reported to the State of Wyoming as a potential abuse issue."
[¶21] Mr. Kaufman presented no evidence to refute RHD's evidence that Mr. Filipi did not instruct him to refrain from submitting an abuse report and that he wanted a report submitted.[4] Instead, he revised his claim to allege that Mr. Filipi wanted to review the report before its submission so that he could "sanitize" the report and conceal his practice of having physical therapy forced on nursing home residents to increase the home's revenue. In support of his revised allegation, Mr. Kaufman offered what we view as three categories of evidence that he claims create an issue of material fact concerning his prima facie case: 1) evidence purporting to show Mr. Filipi's past failures to adequately respond to abuse reports and his practice of forcing physical therapy on nursing home residents; 2) evidence of Mr. Filipi's comments concerning the June 9, 2017 incident, his desire to review the abuse report, and his criticism of Mr. Kaufman's report; and 3) the final report submitted by Mr. Filipi and the director of nursing, which Mr. Kaufman *310 characterizes as "false." We will address each category of evidence in turn.
1. Past Incidents Involving Mr. Filipi
[¶22] Mr. Kaufman alleges that Mr. Filipi wanted to review the incident report before its submission so that he could sanitize it and keep Mr. Kaufman from interfering with his practice of forcing physical therapy on residents in order to increase the nursing home's revenue. In support of this allegation, Mr. Kaufman submitted an affidavit, which stated, in relevant part (footnote added):
8. Before my hiring, RHD did not inform me that RHD's management of the Nursing Home was deemed "deficient" in several areas by the Department of Health and Human Services Centers for Medicare and Medicaid Services ("CMS") on a June 2016 State Survey, or that as part of such Survey, the Nursing Home entered into a Plan of Correction requiring the facility to "ensure that all allegations of abuse are reported to the appropriate state agencies."
* * * *
19. I learned that the CMS State Survey cited the Nursing Home for failure to comply with resident abuse reporting requirements, including but not limited to a May 15, 2016 forced feeding incident, verbal abuse of a resident by a nurse, RHD's non-responsiveness to complaints made by a resident's family members, and RHD's failure to cause the Nursing Home to take additional actions to ensure resident safety and to report abuse allegations to the appropriate state agency.
20. I learned that in July 2016, CMS required the Nursing Home to implement a "plan of correction" in order to continue to participate in, and receive reimbursement from, the Medicare Program, and that Filipi agreed to the plan of correction as a signatory and as part of RHD's management of the Nursing Home (Filipi was the Administrator of the Nursing Home at that time).
21. The required corrective actions included the requirement that "all allegations of abuse are reported to appropriate state agencies" and "any potential abuse found will be investigated promptly and thoroughly with a full report of findings sent to the appropriate state agency."
* * * *
58. In my follow-up to the investigation of the June 9 incident, and in preparation for this matter, I obtained information from another physical therapist that worked at the Nursing Home while Filipi was administrator. Said physical therapist indicated that Filipi improperly inflated RUG[5] levels by "constantly pressuring the physical therapy staff to spend more time with each patient than they could tolerate for billing purposes, and were asked to perform procedures that were unnecessary, unethical or downright mean." The physical therapist further indicated that his company's physical therapy contract was terminated and RHD apparently hired two subsequent companies that they could pressure into that conduct.
59. Based on my report, Filipi realized that I would not be coerced into or be complicit with his practice of pressuring providers to increase RUG levels and reimbursement; instead, I was a resident/patient advocate, who respected clinical judgment based on the needs of the residents, and would not apply Filipi's administrative mandates to meet inappropriate productivity quotas.
60. By standing up against Mr. Filipi and filing the elder abuse report, Filipi became aware that prior practices of forcing therapy on residents would not be tolerated, and would likely result in further federal and state regulatory scrutiny and review of the Nursing Home, and might result in the Platte County Hospital District Board of Trustees terminating the Agreement for Nursing Home Management Services with RHD.
61. That was the real reason for Mr. Filipi's clear threat and intent to fire me, and as a newly-licensed Administrator in a state with few available Administrator jobs, I was certain that being fired after only one month on the job would damage my entire career as a nursing home administrator.
*311 [¶23] "Speculation, conjecture, the suggestion of a possibility, guesses, or even probability are insufficient to establish an issue of material fact." RB, Jr. by and through Brown v. Big Horn County Sch. Dist. No. 3 , 2017 WY 13, ¶ 30, 388 P.3d 542, 551 (Wyo. 2017) (quoting Jones v. Schabron , 2005 WY 65, ¶ 11, 113 P.3d 34, 38 (Wyo. 2005) ). Additionally, Rule 56 requires that facts offered in support of or in opposition to summary judgment must be supported by admissible evidence.
(c) Procedures .
(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.
W.R.C.P. 56(c).
[¶24] The above-quoted paragraphs of Mr. Kaufman's affidavit are replete with conjecture, inadmissible hearsay, and matters outside Mr. Kaufman's personal knowledge. Additionally, the "state survey," referenced in paragraphs 8 and 19, was not attached to the affidavit or otherwise contained in the record. The same is true of the "plan of correction" referenced in paragraphs 8, 20, and 21. Because none of the above-quoted paragraphs complies with Rule 56(c), they cannot create a genuine issue of fact.[6]
2. Mr. Filipi's Review and Criticism of Mr. Kaufman's Report
[¶25] The next category of evidence is Mr. Filipi's review and criticism of Mr. Kaufman's report, which Mr. Kaufman contends created a question of fact concerning his claim that Mr. Filipi wanted to sanitize the report. Mr. Kaufman stated as follows by affidavit:
14. By email, Filipi attempted to downplay the incident, about which he knew nothing, and blamed the resident for making similar previous comments and stated that she had "added a lot of drama to her story".
15. Filipi recommended that I attempt to corroborate the resident's story with other staff members, so I proceeded with the investigation by contacting the Nursing Home's Director of Nursing Services ["DON"].
* * * *
23. After conducting additional investigation, and after receipt of the attending nurse's Grievance Form, I emailed Mr. Filipi and the manager of the PT company (Beth Payne) on June 20, 2017, informing them the incident should be reported to *312 the State of Wyoming. The email was soon followed up with a three-way conversation between Filipi, Payne, and myself, and during that conversation, I sent to both of them the attending nurse's Grievance Form that corroborated the resident's complaint by a disinterested third party with firsthand knowledge of the interaction.
24. It was my understanding based on that phone call that Filipi was supportive of reporting the incident to proper state agencies, and is why I stated in my elder abuse report that "[I]t was the consensus of the regional manager, administrator, and director of nursing that this issue should be reported to the State of Wyoming as a potential abuse issue".
25. Filipi called me directly after the three-way conference call ended, and stated that physical therapy was an important revenue source for the Nursing Home, he reminded me of the difficulty in obtaining physical therapy services for the Nursing Home (and the number of other physical therapy companies that had come and gone), and implied that physical therapy at the Nursing Home (and lucrative Medicare reimbursements for providing physical therapy to residents) could be at risk by submitting the elder abuse report.
26. During the same phone call, Mr. Filipi also reminded me that the resident was found to be unreliable, notwithstanding that we had the attending nurse's firsthand account in the Grievance Form.
27. At an earlier point in my employment by RHD as the Nursing Home Administrator, Filipi told me in person that an individual from the Wyoming DFS Adult Protective Services was difficult to deal with, had investigated several Nursing Home employees individually for their purported conduct, and stated that "you don't want her here at this facility."
* * * *
33. Sometime after arriving at the Nursing Home in the evening of June 20, Filipi entered my office and resumed the discussion of how delicate the situation was because of the importance of physical therapy to the Nursing Home, and stated that the Nursing Home had 5 days within which to submit an elder abuse report.
34. ... I informed Filipi that I had already submitted the report, and provided him a file that contained the hard copy of the report and accompanying documents.
35. Filipi read the report and became visibly angry and upset. He repeatedly asked me, "You submitted this? You submitted the actual emails? You submitted the Grievance Form?" He then began yelling at me that I had done the report wrong, had made him look bad by the information I had provided in the report, and reiterated that he instructed me not to file the report until he had reviewed it. He repeated in a raised voice, "I can't believe you submitted this".
* * * *
37. I responded to Filipi that he had reviewed the report because all of the information and materials in the report had already been sent to him earlier that day during various communications.
38. Filipi became even angrier, and kept repeating that I should not have submitted that report, that I had done it all wrong, that it was a minor issue, and that my report did not contain a solution.
39. After an intervening period, I asked Filipi what we should do, and he responded that both of us should work on a revised or final report to submit later in the week, and then he indicated that he needed to talk with the PT to smooth things over....
40. I spent the day of June 21 and 22 traveling to and from Nebraska to attend job training, and was not at the Nursing Home.
41. I returned to the Nursing Home on June 23, and attended our regular stand-up meeting in the morning and noticed that Filipi was also in attendance, which was unusual.
42. Filipi was visibly agitated by his demeanor and his interjections in the meeting; I tried on several occasions to talk with him and to figure out what was wrong and when we were going to work on finalizing the report.
* * * *
*313 44. When I finally encountered Filipi in the hallway, I asked him to join me in my office, whereupon I asked why he was angry and he told me that because of my report, he had to do lots of damage control with the PT, and had to talk the PT out of quitting.
45. Filipi then told me that the PT reported that the PT and the resident had reached some type of settlement amongst them, and that therefore the report I made should never have been sent because the issue had been resolved internally.
46. I responded that I had not spoke with the PT because he was not an employee of the Nursing Home, but that I had instead contacted PT's manager (Beth Payne).
47. Filipi then reprimanded me for including the emails in my report and including the attending nurse's Grievance Form; he told me on several occasions throughout the conversation that I did not understand the implications of my report and that the State of Wyoming could come through the door at any time after receiving a report like that. He reiterated that the emails were not the way to submit the report and that the State could read into something in his email and make a big deal out of it.
[¶26] We have defined the evidence required to support an employee's prima facie case as
[e]vidence good and sufficient on its face. Such evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient. Evidence which, if unexplained or uncontradicted, is sufficient to sustain a judgment in favor of the issue which it supports, but which may be contradicted by other evidence .
King , ¶ 29, 357 P.3d at 762 (quoting Kruzich v. Martin-Harris Gallery, LLC , 2006 WY 7, ¶ 16, 126 P.3d 867, 874 (Wyo. 2006) ) (emphasis in King ). Judged against this standard, we must conclude that the above-quoted affidavit excerpts also fail to create a question of fact that would make Mr. Kaufman's prima facie claim a triable issue.
[¶27] Paragraphs 14 and 15 reference an email that is in the record. Setting aside Mr. Kaufman's characterizations and commentary, Mr. Filipi's actual statement referenced a prior incident with the same resident, which caused him to question her credibility. Mr. Filipi's email reads:
I'm pretty positive that [the resident] made comments pretty similar in one of her previous stays. I hope I'm thinking of the same resident. After digging into that situation there were two other staff members present that gave different stories than hers that both lined up and contradicted what she said and that she added a lot of drama to her story. I would find out what time this happened and see if there were other staff members around or other residents that are better historians and see what they have to say. Let me know what you find out.
[¶28] Mr. Filipi did not instruct Mr. Kaufman to ignore the complaint. He instructed him to investigate and if possible corroborate it. Even viewing the email in the light most favorable to Mr. Kaufman, we are unable to find that it in any way contributes to a question of fact regarding Mr. Kaufman's prima facie claim.
[¶29] The upshot of paragraphs 23 through 26, again setting aside Mr. Kaufman's assumptions and characterizations, is that Mr. Filipi wanted the incident reported but he was concerned with the report's effect on physical therapy services and with the resident's account of the incident. Again, even giving Mr. Kaufman all favorable inferences from this evidence, we are unable to find that it creates an issue of material fact. We have said that "[g]uesswork is not a substitute for evidence or inference, and inference cannot be based on mere possibility." Cook v. Shoshone First Bank , 2006 WY 13, ¶ 44, 126 P.3d 886, 896 (Wyo. 2006) (quoting Jones , ¶ 23, 113 P.3d at 39-40 ). To draw some sort of subterfuge from Mr. Filipi's airing of his concerns regarding the incident and the report is a departure from inference and amounts to no more than the same conjecture we rejected above.
[¶30] Paragraph 27 references a conversation unrelated to the June 9, 2017 incident *314 and for which no context is provided. We can find no inference that may be reasonably drawn in Mr. Kaufman's favor to create a genuine issue of fact.
[¶31] The remaining paragraphs detail the fallout from Mr. Kaufman's submission of his abuse report without Mr. Filipi's review. In considering this evidence, we must give Mr. Kaufman all favorable inferences that may reasonably be drawn from it, but we are also mindful of the narrow scope of the public policy exception to at-will terminations. See McLean , ¶ 23, 34 P.3d at 1268 ("[The] public policy exception is narrow in scope to avoid unreasonably eliminating employer discretion in terminating at-will employees."). Our reluctance to interfere with an employer's at-will termination decisions extends with equal, if not greater, force to an employer's discretion to establish and enforce internal procedures and protocols. In the absence of a showing that those protocols and procedures violate or undermine the reporting statute, we must take care to avoid an unjustified and unreasonable intrusion.
[¶32] The reporting statute, Wyo. Stat. Ann. § 35-20-103, does not bar an employer from requiring supervisory review of abuse reports, and it does not require disclosure of management's deliberative emails, or even its internal processing and reporting forms. We therefore draw no inferences from Mr. Filipi's enforcement of his protocols and process. Turning then to the statements attributed to Mr. Filipi, even giving Mr. Kaufman any reasonable favorable inferences, the most we are able to glean from the evidence is that Mr. Filipi wanted the report submitted in a different manner and he was concerned with the physical therapist's response to the report.[7] It is again pure conjecture to suggest that from this evidence one can draw an intention to cover up abuse so that an illegal practice of forcing physical therapy would not be revealed. This evidence again, therefore, fails to create a genuine issue of fact as to Mr. Kaufman's prima facie claim.
3. Final Abuse Report
[¶33] The remaining evidence Mr. Kaufman points to as creating a genuine issue of material fact is the final report Mr. Filipi and the director of nursing submitted to the State. Mr. Kaufman argues the report is false because it categorizes the nature of the event as "Mistreatment," rather than "Verbal Abuse," and because it states that it is unclear what the physical therapist said to *315 the resident. We have reviewed the report, and we disagree that it is false or otherwise creates an issue of material fact.
[¶34] First, with regard to the report's identification of the incident as one of mistreatment, rather than verbal abuse, this is a distinction without much of a difference for purposes of the report. The nursing home's "Policies and Procedures" defines "mistreatment" as "To treat wrongly or badly contrary to the Nursing Home's policies and compromising the resident's physical or emotional integrity." It defines "verbal abuse" as "Any use of oral, written or gestured language that willfully includes disparaging and derogatory terms to residents or their families or within their hearing distance, regardless of their age, ability to comprehend or disability. Examples of verbal abuse include, but are not limited to: Threats of harm; saying things to frighten a resident, name calling, threats of punishment in any form, such as telling a resident that he/she will never be able to see his/her family again." Mistreatment is a broader, more general category, that arguably includes verbal abuse. Use of one term over the other cannot reasonably be construed as a whitewash, particularly in light of the remainder of the report.
[¶35] The report confirms that the incident occurred, and it confirms that the resident's attending nurse was a witness. It states, "It is unclear whether [the physical therapist] told Resident that she would be kicked out/thrown out/discharged from facility/Medicare if she did not participate in therapy." The report then goes on to state that "[the physical therapist] should have taken a different approach and with resident['s] anxiety and health issues that evening it would have been in everybody's best interests to come back the next day." The report cannot be characterized as false, and no reasonable inference may be drawn from the report that it was an attempt to cover up an illegal practice of forcing physical therapy on nursing home residents.
[¶36] The evidence Mr. Kaufman submitted in response to RHD's motion for summary judgment failed to create a disputed issue of material fact that would make his prima facie claim a triable issue. We therefore have no need to address the remaining showings required under the burden shifting analysis, and we uphold the district court's grant of summary judgment to RHD.
[¶37] Affirmed.

Physical therapy services were provided to residents of the nursing home by an independent contractor physical therapy firm.

While it is not entirely clear from the record, we understand the ombudsman referenced in the report to be the long term care ombudsman who is statutorily charged with investigating, advocating, and mediating on behalf of adults applying for or receiving long term care services. See Wyo. Stat. Ann. § 9-2-1304 (LexisNexis 2017).

Mr. Kaufman does not dispute that his employment with RHD was at-will.

Mr. Kaufman's attorney in fact conceded during his summary judgment argument to the district court that he did not dispute that Mr. Filipi wanted the report submitted.
THE COURT: But in terms of the public policy exception, this isn't so much what was originally alleged that they didn't allow him to file it; right? I mean, I guess the evidence that I've read is that everybody agreed that it was going to be filed.
[PLAINTIFF'S COUNSEL]: That is correct. We can't deny that there was this general consensus. There was a three-way phone call, and it was agreed that they had to be filed....

The affidavit does not define what the acronym "RUG" stands for.

W.R.C.P. 56 was amended in 2017 to align with its federal counterpart, which was amended in 2010. The affidavit requirements previously found at Rule 56(e) were renumbered and are now found at Rule 56(c)(4). Although the express statement that any materials referenced in an affidavit must be attached to the affidavit was omitted, it is still required because of Rule 56(c)(1)(A) 's requirement that any material cited be in the record. See Fed.R.Civ.P. 56(c) advisory committee's note to 2010 amendment ("Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1). Other provisions are relocated or omitted. The requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record.").

While we give Mr. Kaufman all favorable inferences that may be reasonably drawn from the evidence, that does not mean that we are required to ignore undisputed facts in the record. See McGarvey , ¶ 7, 211 P.3d at 505 (citation omitted) ("Because we are reviewing a grant of summary judgment against Ms. McGarvey, we consider the facts in a light most favorable to her position. At the same time, we cannot ignore undisputed facts just because they are less favorable to her position."). It is apparent from the undisputed evidence that the damage control that Mr. Filipi stated he was doing with the accused physical therapist related to Mr. Kaufman's filing of the abuse report without first interviewing him.
Q. Well, now we know from this email that it was sometime on June 20th that Mr. Filipi talked to [the physical therapist], right?
A. Yes.
Q. We know you didn't, right?
A. That is correct.
Q. Mr. Filipi told you that [the physical therapist] feels betrayed that nobody from the facility came to talk to him and doesn't understand why he wasn't allowed to tell his side. Do you see that?
A. I do.
Q. Could you understand why [the physical therapist] would feel betrayed and not understand why he wasn't allowed to tell his side of the story before someone submitted an allegation that he had abused an elderly patient to the State of Wyoming?
A. His employer communicated with him.
[COUNSEL]: That's not my question. Will you please read back my question. (Last question read by the reporter.)
A. Yes.
Q. You would be upset, wouldn't you, if someone did that to you?
A. Probably.
Q. You would want an opportunity to tell your side of the story before someone reported it to the state?
A. Most likely.
Q. Can you think of a circumstance under which you would not want to have an opportunity to tell your side of the story before someone accused you of abusing an elderly patient to the state?
A. I wasn't accusing; I was reporting.
Q. Can you think of a situation in which you would not want an opportunity to tell your side of the story?
A. I would want to be able to tell my side of the story.