# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 124

APRIL TERM, A.D. 2020

September 24, 2020

YOLANDA VARELA,

Appellant
(Plaintiff),

v.

GOSHEN COUNTY
FAIRGROUNDS, a Wyoming
governmental entity,

Appellee
(Defendant).

S-20-0024

*Appeal from the District Court of Goshen County*
*The Honorable Patrick W. Korell, Judge*

*Representing Appellant:*
> Herbert K. Doby, Attorney at Law, Torrington, Wyoming

*Representing Appellee:*
> Thomas A. Thompson of MacPherson & Thompson, LLC, Rawlins, Wyoming

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Chief Justice.**

[¶1]     Yolanda Varela filed a negligence action against the Goshen County Fairgrounds (the Fairgrounds) after she fell at an event held in one of its buildings.  The district court granted the Fairgrounds summary judgment on its assertion of governmental immunity, after it found no genuine issue of material fact on the question of whether Ms. Varela's claim fell within the waiver of immunity for negligent operation or maintenance of a building or recreation area.  We affirm.

## ISSUE

[¶2]     Ms. Varela presents two issues on appeal, which we restate as the following single question:

> Did the district court err in granting the Fairgrounds summary judgment on the question of whether Yolanda Varela's negligence claim fell within the waiver of governmental immunity for negligent operation or maintenance of a building or recreation area?

## FACTS

[¶3]     The Rendezvous Center is a building on the Goshen County Fairgrounds, which the Fairgrounds operates and rents to the public as an event venue.  On December 16 and 17, 2015, an organization called Santa's Helpers held an event at the Center for children to meet Santa Claus.  Yolanda Varela attended the event with her mother, her daughter, and her grandchildren on the evening of December 17.  Her daughter dropped her off close to the Center's west side entrance, and she walked to the set of double doors at that entrance while cradling her infant grandson in her arms.  When she got to the doors, a man was holding the left door open and she proceeded through that doorway.  As she did, she tripped over a brick or block that was between the left door and the post separating it from the right door, and she fell to her knees.  She did not drop her grandson, but she fractured her left foot, which subsequently required two surgeries.

[¶4]     On August 30, 2018, Ms. Varela filed a complaint against Goshen County, the State of Wyoming, and the Fairgrounds.  The complaint alleged:

> It was the custom of Goshen County and Goshen County Fairground public employee(s), or their agents, in the operation, maintenance and use of the Rendezvous Center to use, or allow others to use, the large concrete brick/block to prop open the west-side door(s).  The brick/block was stored near the west-side doors to facilitate its regular use as a door

1

prop. As a result of such custom and use by Goshen County and Goshen County Fairground public employee(s), or their agents, of said concrete brick/block, to prop open the west-side doors, it was clearly foreseeable that someone would trip and fall over it and be injured. Pursuant to W.S. § 1-39-106, such custom, use, and actions by said public employee(s), or their agents, was negligent and makes Goshen County and Goshen County Fairgrounds liable for the damages suffered by Plaintiff. Such negligent conduct by Goshen County and Goshen County Fairground public employee(s), or their agents, proximately caused the damages suffered by Yolanda Varela.

[¶5] Goshen County and the State of Wyoming were dismissed on stipulation of the parties, and the Fairgrounds then moved for summary judgment on the ground that it was immune from liability under the Wyoming Governmental Claims Act. It argued:

> . . . Plaintiff fails to identify a specific employee, or what the alleged act was that was within the scope of the unidentified employee's duties. Even after the completion of discovery in this matter, Plaintiff can still not identify what was done, who performed the alleged negligent act, or how the alleged negligent act was within the statutory requirement of "scope of duties." This initial inquiry is an essential element to prove any claim under the WGCA and the Act does not allow Plaintiff to simply rely upon speculation or conjecture.

[¶6] The Fairgrounds further argued that Ms. Varela did not state a claim for which its immunity had been waived under the Governmental Claims Act. Specifically, it argued that the placement of a brick or block as a door prop is not the "operation or maintenance" of a public building and therefore the Act's waiver of immunity for the operation or maintenance of a building did not apply.

[¶7] Ms. Varela responded to the summary judgment motion with evidence that at least one Fairgrounds employee knew of the patrons' practice of using a brick or block to prop the Rendezvous Center's doors. She also presented deposition testimony from the patrons themselves that it was a common practice for them to so prop the doors. Based on that evidence, she argued:

> Each of the three (3) public employees knew or should have known about the described customary use and practice of the brick/block to prop open doors at the Rendezvous Center and were negligent in allowing it or not taking reasonable steps to prevent it. If any one of the three (3) public employees did

2

not know of the custom and practice, that "not knowing" was itself negligent. Said negligence of each public employee separately or all three combined, also includes, but is not limited to, a failure to inspect the west-side entrance and remove the particular brick/block door prop in this case.

[¶8]    At oral argument on the summary judgment motion, Ms. Varela argued that the Rendezvous Center should be considered both a building and a recreation area for purposes of determining whether the Wyo. Stat. Ann. § 1-39-106 waiver of immunity applies. After argument, she submitted a supplemental memorandum in which she cited to deposition testimony and argued (record citations omitted):

> Plaintiff submits that to be operational or functional as a building fit as a venue for events, it must be safe (not unreasonably dangerous) to attend and use in order to accomplish its very function and use. Plaintiff additionally submits here that an unsafe condition due to a physical defect in the building also exists in that patrons, guests, attendees and others of the Rendezvous Center were allowed to (arguably forced to), due to the inherent deficiency of the door(s), create, develop and continue the custom and practice of propping open the doors by use of the brick/block or other objects because of an inherent defect in the doors. The doors could not otherwise be successfully propped open. A person had to hold the door open. To prevent the door(s) from locking, one had to use the brick/block or other objects to prop open the door(s). The door(s) would not stay open unless they were propped open by the brick/block or other objects. There was no other way to keep the doors open except by propping them open with the brick/block or other objects and the built-in door hinge would not work to keep the door(s) open. The door(s) would not stay open except by propping them open with the brick/block or other objects. Such users of the facility propped the doors open for various reasons including: (1) preventing the door from closing and locking, and (2) allowing users to hold the doors open to conveniently and efficiently carry items in and out.

[¶9]    The district court granted the Fairgrounds' motion for summary judgment. It concluded:

> Upon close review of Plaintiff's complaint and allegations in this matter, it is apparent Plaintiff is focused on how patrons and guests use the facility by propping the door

3

open as a convenience. Plaintiff is unable to demonstrate, and she offers no material fact, that the doors to the Center are negligently inoperative or negligently maintained by Fairgrounds' employees. Plaintiff also presents no material fact of any physical defect in the doors that prevent the doors from functioning properly. There is no material fact to support a conclusion that the brick or block is part of the building itself or it is necessary for the Rendezvous Center to function as a venue for events.

[¶10] The district court further concluded that regardless of whether the Rendezvous Center is treated as a building or a recreation area, the result is the same. Ms. Varela timely appealed the summary judgment order to this Court.

## SUMMARY JUDGMENT

[¶11] W.R.C.P. 56 governs summary judgment and imposes obligations on the movant and nonmovant.

> The party requesting summary judgment bears the initial burden of establishing a prima facie case that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law. W.R.C.P. 56(c); *Throckmartin v. Century 21 Top Realty*, 2010 WY 23, ¶ 12, 226 P.3d 793, 798 (Wyo. 2010). Until the movant has made a prima facie showing that there are no genuine issues of material fact, the nonmovant has no obligation to respond to the motion with materials beyond the pleadings. *Id*.

> Once a prima facie showing is made, the burden shifts to the party opposing the motion to present evidence showing that there are genuine issues of material fact. *Boehm v. Cody Cntry. Chamber of Commerce*, 748 P.2d 704, 710 (Wyo. 1987) (citing *England v. Simmons*, 728 P.2d 1137, 1140-41 (Wyo. 1986)). The party opposing the motion must present specific facts; relying on conclusory statements or mere opinion will not satisfy that burden, nor will relying solely upon allegations and pleadings. *Boehm*, 748 P.2d at 710. However, the facts presented are considered from the vantage point most favorable to the party opposing the motion, and that party is given the benefit of all favorable inferences that may fairly be drawn from the record. [*Union Pacific R. Co. v.*] *Caballo Coal Co.*, ¶ 12, 246 P.3d [867], 871 [(Wyo. 2011)].

4

*Kaufman v. Rural Health Dev., Inc.*, 2019 WY 62, ¶ 14, 442 P.3d 303, 307-08 (Wyo. 2019) (quoting *Bogdanski v. Budzik*, 2018 WY 7, ¶ 18, 408 P.3d 1156, 1160-61 (Wyo. 2018)).

[¶12]  Our review of a district court's grant of summary judgment is de novo.  We have said:

> We review a district court's order granting summary judgment de novo and afford no deference to the district court's ruling. *Thornock v. PacifiCorp*, 2016 WY 93, ¶ 10, 379 P.3d 175, 179 (Wyo. 2016). This Court reviews the same materials and uses the same legal standard as the district court. *Id.* The record is assessed from the vantage point most favorable to the party opposing the motion ..., and we give a party opposing summary judgment the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* A material fact is one that would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id.*

*Kaufman*, ¶ 15, 442 P.3d at 308 (quoting *Wyo. Jet Center, LLC v. Jackson Hole Airport Bd.*, 2019 WY 6, ¶ 10, 432 P.3d 910, 914 (Wyo. 2019)).

## DISCUSSION

[¶13]  "The Wyoming Governmental Claims Act 'provides broad governmental immunity from tort liability.'" *Fugle v. Sublette Cty. Sch. Dist. No. 9*, 2015 WY 98, ¶ 6, 353 P.3d 732, 734 (Wyo. 2015) (quoting *Sinclair v. City of Gillette*, 2012 WY 19, ¶ 10, 270 P.3d 644, 646 (Wyo. 2012)).  It is a closed-end tort claims act, meaning that it bars any claim against a governmental entity or its employees unless it falls within one of the statutory exceptions. *Craft v. State ex rel. Wyo. Dep't of Health*, 2020 WY 70, ¶ 27, 465 P.3d 395, 403 (Wyo. 2020) (citing *Wyo. Dep't of Corr. v. Watts*, 2008 WY 19, ¶ 14, 177 P.3d 793, 797 (Wyo. 2008)).  One such exception is section 106 of the Act, which provides:

> A governmental entity is liable for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, recreation area or public park.

Wyo. Stat. Ann. § 1-39-106 (LexisNexis 2019).

[¶14]  Ms. Varela contends that issues of material fact preclude summary judgment on the question of whether the Fairgrounds and its employees were negligent in the operation or

5

maintenance of the Rendezvous Center as a building. Alternatively, she argues that issues of material fact preclude summary judgment on the question of whether they were negligent in their operation or maintenance of the Center as a recreation area. We will address each claim separately.

## A.      Operation and Maintenance of the Rendezvous Center as a Building

[¶15]  As used in Wyo. Stat. Ann. § 1-39-106, "operation" means the "state of being operative or functional" or "the process of operating or mode of action." *Fugle*, ¶ 10, 353 P.3d at 735 (quoting *Watts*, ¶ 21, 177 P.3d at 799). Based on this definition, we have said that any waiver of governmental immunity under the section 106 exception is limited to a governmental entity's "negligence in making a building functional and, accordingly, applies only to unsafe conditions due to physical defects in the building itself." *Fugle*, ¶ 9, 353 P.3d at 735; *see also Watts*, ¶ 21, 177 P.3d at 799. In keeping with that limitation, in *Watts*, we rejected a line of New Mexico decisions that extended a similar waiver to negligence unrelated to the physical building itself.

> We are not, however, inclined to agree that any "unsafe condition," beyond those involving the building itself, should come within the statute . . . . Instead, we believe the waiver of immunity in Wyoming was intended to apply only if the unsafe condition is due to a physical defect in the building. The concept of physical defect would include any safety features mandated by applicable law[.]

*Watts*, ¶ 36, 177 P.3d at 802.

[¶16]  Similarly, we have limited the section 106 waiver of immunity for maintenance of a building. "'[M]aintenance' means, 'the labor of keeping something (as buildings or equipment) in a state of repair or efficiency: care, upkeep.'" *Soles v. State*, 809 P.2d 772, 773 (Wyo. 1991) (quoting Webster's Third New International Dictionary 1362 (1986)). "[T]he maintenance of a building is that done on or to a building." *Watts*, ¶ 25, 177 P.3d at 800 (quoting *City of Cheyenne v. Huitt*, 844 P.2d 1102, 1105 (Wyo. 1993)). Inspection of a building does not fall within the definition of maintenance. *Watts,* ¶ 25, 177 P.3d at 800 (citing *Soles*, 809 P.2d at 773-74)).

[¶17]  In *Watts*, we summarized the limitations on the section 106 waiver of immunity for operation or maintenance of a building as follows:

> We, therefore, conclude the clear and unambiguous language of § 1-39-106, within the context of the rest of the WGCA, indicates that the legislature intended to limit the waiver of immunity to negligence associated with the function

of the building structure . . . . The operation and maintenance responsibility includes fixtures attached to the building. Moreover, . . . if applicable building codes, statutes or ordinances mandate that certain safety features be installed or in use in the building, then liability would extend to injuries arising from the failure of the governmental entity to install or maintain those devices. We have no difficulty stating that such matters fall within the definition of operation of public buildings because they are necessary to make the building legally functional.

*Watts*, ¶ 38, 177 P.3d at 802.[1]

[¶18]   Against these parameters, we consider Ms. Varela's assertion that disputed issues of fact exist as to whether her negligence claim falls within the waiver of immunity for the operation or maintenance of a public building.  Her original claim, made in her complaint and summary judgment response, and which she maintains on appeal, asserts that the Fairgrounds employees were negligent because they knew or should have known of the door-propping practice and taken reasonable steps to prevent patrons from doing it.  This claim, though supported by evidence, alleges neither a defect in the Rendezvous Center building nor negligence in something the Fairgrounds employees did to or on the building. It instead alleges an unsafe practice by the Center's patrons and a failure of the Fairgrounds employees to monitor the patrons and control their actions, which takes it outside the scope of Wyo. Stat. Ann. § 1-39-106.  *See Watts*, ¶¶ 39-42, 177 P.3d at 803 (claim that State failed to properly guard and monitor Honor Farm inmate and thereby failed to protect employee from attack by inmate did not assert defect in physical structure of building itself and was therefore outside section 106 waiver of immunity).

[¶19]   Ms. Varela's expanded claim, made in her supplemental briefing on summary judgment and also argued on appeal, asserts that the Rendezvous Center's west side doors were inherently defective.  She claims that patrons were forced to prop the doors to prevent being locked out and to allow them to "conveniently and efficiently carry items in and out," and she argues that the locking on closure and inability to keep the doors open are physical defects in the building.  We will first address Ms. Varela's claim that the doors were

---

[1] Ms. Varela asks us to revisit the narrow interpretation we have given Wyo. Stat. Ann. § 1-39-106.  In *Watts*, we invited the legislature "to revise the statute if we have not interpreted it in accordance with its intent." *Watts*, ¶ 38, 177 P.3d at 802-03.  The legislature did not do so, and we therefore presume that it has acquiesced in our interpretation.  *See Harnetty v. State*, 2019 WY 21, ¶ 25, 435 P.3d 368, 373 (Wyo. 2019) ("When this Court interprets a statute and the legislature makes no material legislative change in the provision thereafter, the legislature is presumed to acquiesce in the Court's interpretation.") (quoting *In re ANO*, 2006 WY 74, ¶ 14, 136 P.3d 797, 801 (Wyo. 2006)). That being the case, as we stated in *Fugle*, a plea to broaden the scope of the section 106 waiver is one best made to the legislature. *Fugle*, ¶ 21, 353 P.3d at 740.

defective because they would lock on closure if not propped, and then her claim that they were defective because they had to be propped to allow for the carrying of items in and out.

## 1. Defect in Door Locking Mechanism

[¶20]  In support of her claim that the Center's doors were defective because they would automatically lock on closure, Ms. Varela cites the testimony of Scott Feagler, a former Fairgrounds employee who was its maintenance supervisor on the date of her injury.  Mr. Feagler testified (objections omitted):

> Q.      In your training and experience, do you know why door – doors on certain buildings where the public has access have push bars?
>
> A.      It's the release mechanism to unlatch the door.
>
> Q.      Are you familiar with – You're familiar with [the west side] doors?
>
> A.      Yes.
>
> * * * *
>
> Q.      Now, can those doors be locked so that somebody can't get in from the outside?
>
> A.      Yes.
>
> Q.      If they were so locked and somebody was trying to get out through those same doors, could they do that without unlocking it?
>
> A.      Yes.
>
> Q.      And how would they do that?
>
> A.      Push the bar and unlatch and exit.
>
> Q.      If the doors [on the west side] are locked from – so you can't enter from the outside, can you – is there some process or procedure that can be applied so that you can keep them from locking when they shut?

8

A.     I don't recall specifically on these doors if there is an allen wrench access to – to keep the locking mechanism back.

Q.     On these doors during your tenure out there from 2012 to 2017, did you ever use the allen wrench tool that you just described to lock or unlock the doors?

A.     I don't recall having occasion to do it on these doors.

Q.     Now, is that allen wrench tool the only way that those doors can be set so they don't lock from the outside when those doors close?

A.     If there was an allen wrench accommodation on these doors, that would be true.

Q.     Now, if one didn't – This is speculation. But if one didn't have an allen wrench tool to set that push bar, then one would prop the door open to keep it from shutting, right?

A.     I'm not understanding the question.

Q.     If – If one was on the inside of those doors and another person was on the outside of those doors, and the person on the outside of the doors couldn't get in because it was locked, the person from the inside could push the push bar and let them in, right?

A.     That's correct.

Q.     Now, once the person on the outside came in and there were two of them on the inside, what – if they didn't have the allen wrench tool, what could they do to keep the door from locking when it shut?

A.     In doors of that nature, there would nothing that you could do, it would lock.

Q.     Unless you propped it open with something, right?

A.     To keep the door from latching, you would have to circumvent the latch somehow or make it so the door couldn't close fully.

Q.    And a brick could be used for that purpose, right?

A.    Yes, any number of things including a brick could be used.

Q.    So during your tenure there from 2012 through December of 2017, you personally never employed the allen wrench tool to either lock or unlock those doors?

A.    I do not recall these doors having that mechanism, so I don't recall locking those doors with an allen wrench.

Q.    Okay. During your tenure there and I think you testified I think when you first went to work there, you did janitorial and whatever else is in there. Did you ever use – Did you personally ever go let somebody in those – from the outside using those west side doors?

A.    No, not that I recall.

Q.    So if somebody wanted to get in, it was just always unlocked?

A.    The biggest percentage of the time those doors were unlocked.

[¶21]  We are unable to draw an inference from Mr. Feagler's testimony that the locking mechanism on the Rendezvous Center's west side doors was defective.  It is apparent from his testimony that he could not recall what type of locking mechanism the west side doors used.  The most that we can reasonably draw from his testimony is that if the doors were locked, and if the doors did not have an allen wrench mechanism to allow the lock to be bypassed, they would have to be propped open to allow reentry upon exiting.  Mr. Feagler also testified, however, that the Rendezvous Center's doors were usually unlocked.  This means that they are capable of being placed in an unlocked position that would allow ready ingress and egress, even though Mr. Feagler did not recall the precise mechanism.

[¶22]  This conclusion is confirmed by other evidence in the record.  For example, one community member testified that he had used the Rendezvous Center for numerous events over the past several years and the doors locking on closure was not his reason for propping them.  He testified:

10

Q. Can these doors be set so that when you shut the door, you can open it from the outside?

A. Yeah, they would have to be.

Q. And with that in your mind would that necessitate the need for a brick or block?

A. The concern for us was never the door relocking, it was having the door open to haul heavy items in.

[¶23] Additionally, Stephanie Lofink, the Fairgrounds general manager since 2004, testified that the west side doors do have an allen wrench mechanism to keep them in an unlocked position. Theresa Prado, the Fairgrounds sanitation specialist, agreed and testified:

Q. . . . Are [the west side doors] locked from the outside when they shut?

A. No.

Q. And can you lock them so they're locked from the outside when they're shut?

A. Yes.

Q. How do you do that?

A. An allen wrench.

Q. And the allen wrench – What do you do with the allen wrench?

A. There's a slot on this side of the – and you turn it and it will engage this piece.

Q. You're talking about the left side?

A. Both. This one is automatic so it would have to be shut off up top. But you can allen wrench both of them to lock or unlock.

11

[¶24] Concerning the Fairgrounds policy for locking and unlocking the Rendezvous Center doors, Ms. Lofink testified that they do not provide patrons with an allen wrench to control the locking mechanism on the Center's west side doors. She further testified:

> A. We do not have a policy to administer keys to patrons. So when someone rents our facility, it is my responsibility to make sure that we communicate as to the times that they need in and out of the building. So we are contacted to lock up or come unlock – we're here, come unlock for us so we can get in, that sort of thing.
>
> Q. Okay. Now, if someone contacts you and says, please come unlock for us, what do you do in response to that request?
>
> A. I go unlock the building.

[¶25] Despite the testimony that the west side doors to the Rendezvous Center have an allen wrench mechanism to keep them in an unlocked position, and about Ms. Lofink's efforts to ensure that its doors are unlocked for all events, the record does contain the deposition testimony of patrons who arrived for events to find the Center's west side doors locked. They testified that in such cases, they would use objects, including a block or brick, to prop them so they would not lock upon closing. For example, one community member testified:

> Q. When you were out there to set up for an event, have you – when you approach those two doors from the outside, have you ever discovered that they're locked?
>
> A. Yes.
>
> Q. Okay. What would do in that instance?
>
> A. I would – I would basically walk around the whole building and try to find an open door if I was part of an event to use that facility knowing that it should be unlocked.
>
> Q. Okay. Now, if you then – So could you – you could come from inside out the west doors once you got into the facility?
>
> A. Yes.

Q. Okay. What would happen if you did what I just said and the doors shut, would you be locked in or not – or I mean locked out?

A. I would be locked out, yes.

Q. Okay.

A. So I would immediately try to find something to keep me from being locked out.

Q. What do you mean something?

A. I would go try to find a rock like I've said before or that rope or sometimes I recall there being chairs in that entranceway, you could use a chair as well. Anything that would open the door.

[¶26] Clearly, on at least some occasions, the Rendezvous Center's west side doors were locked and would not allow ready entry and exit. Under our precedent, however, to state a claim within the section 106 waiver of immunity, the record must contain evidence that the doors were locked due to a physical defect in the doors or their locking mechanism. The record here contains no such evidence and no evidence from which such a defect may reasonably be inferred. It contains no expert report that the locking mechanism was defective, no evidence of repairs to the locking mechanism, and no evidence that on or around the date of Ms. Varela's injury, patrons or employees were having difficulty with the locking mechanism. Based on the record, then, the most that may reasonably be inferred concerning the doors locking on closure is that the Fairgrounds did not provide patrons with an allen wrench and instructions on its use, and that it failed to ensure that the Center's doors were unlocked for all events. To the extent that either omission could state a claim for negligence, it is not the type of claim for which Wyo. Stat. Ann. § 1-39-106 provides a waiver of governmental immunity.[2]

---

[2] The only evidence concerning whether the Center's west side doors were locked or unlocked during the event at which Ms. Varela suffered her injuries was the testimony of Stephanie Lofink. She testified:

> Q. Did you on December 17th of '15 go and unlock the west entrance doors for the Santa's Helpers event?
> A. When Santa's Helpers does their setup, they start their setup, so the doors are unlocked when we get to work first thing in the morning and they're left unlocked.
> Q. Who has unlocked them?
> A. Whichever employee gets to work first.

## 2. __Defect in Door Propping Mechanism__

[¶27]  Ms. Varela contends that in order to be operational or functional as an event venue, the Rendezvous Center had to be safe for patrons to enter and use.  She further contends that because the doors would not stay open without propping, patrons used objects to prop the door, which in turn led to an unsafe condition.  On that basis she claims that the Center's doors were inherently defective and that she has therefore asserted a negligence claim for which the Fairgrounds' immunity is waived under Wyo. Stat. Ann. § 1-39-106.  We disagree.

[¶28]  Ms. Varela's claim is similar to the claim made in *Watts*.  In that case, a nurse working in the administration building of the Wyoming Honor Farm was murdered by an inmate and her husband filed a wrongful death claim against the Department of Corrections.  *Watts*, ¶¶ 3-4, 177 P.3d at 794.  He argued that under section 106 a building's operation must be viewed in light of its purpose.  *Id.* ¶ 22, 177 P.3d at 799.  Given that the building was part of a prison, he claimed that the Department's failure to install security cameras in the medical offices made the administration building unsafe for its intended purpose, and that he had therefore stated a claim of negligence in the operation or maintenance of the building.  *Id.* ¶ 40, 177 P.3d at 803.  We rejected the claim because it did not identify a physical defect in the building itself or the omission of a fixture mandated by a building code or other law.  *Id.*

[¶29]  The same is true of Ms. Varela's claim.  What she alleges is not a physical defect in the Rendezvous Center's doors, but is instead a feature that she contends the doors should have—a built-in propping mechanism.  As in *Watts*, however, she has not shown that such a mechanism is mandated by a building code or other law.  Nor has she shown that having a built-in propping mechanism is essential to the function of the Center.  *See Fugle*, ¶ 13, 353 P.3d at 736 (asserted deficiency must be necessary to the function of the building structure).  She asserts only that the evidence shows that the west side doors were propped with objects for the purpose of "allowing users to hold the doors open to conveniently and efficiently carry items in and out."  Although making access for loading and unloading convenient and efficient may be desirable, we are unable to say that it is essential to the function of the building.[3]

[¶30]  We also note that the record suggests that the doors do in fact have a built-in propping function, though it does not tell us if that mechanism was in place in December 2015.  Theresa Prado, the Fairgrounds sanitation specialist, testified:

> A.    The west doors have been propped open, yes.

---

[3] The record shows that options to propping the door with an object included having another person hold the door open and using the handicap access button to automatically open the door.

Q. By what means, how were they propped open?

A. They – They automatically stay held open if you push them open, they will lock on top to stay open.

Q. If they're in that condition, what do you do if you want to close them?

A. Just pull them closed.

Q. How much force do you have to use?

A. Hardly none.

Q. The wind can –

A. No, the wind can't.

[¶31] Ms. Varela does not identify a particular defect in the doors' propping mechanism, and in our review of the record, we did not find sufficient evidence to create an issue of material fact on the question of such a defect. The record contains no expert examination of the doors, no evidence of repairs done to the doors, and no evidence of concerns that Fairgrounds employees may have had regarding the doors' operation.

[¶32] What the record does contain is the testimony of numerous patrons concerning the operation of the Rendezvous Center's west side doors over extended and varying periods of time. Several testified that over a period of years, and multiple events at the Center, the doors would stay open only if propped with an object. Only one patron testified to the functioning of the built-in propping mechanism:

Q. Sir, these [west side doors] as depicted in Exhibit 1, did they have a way where you could keep them open without using a brick or a block?

A. There used to be but I recall the mechanism to be non-functioning.

Q. What was the way that the door used to be used to be left open without a brick or a block or a prop of some sort?

A. I can recall on the right side door of the two doors, that one is a manual – they're both manual doors but the right side is not the handicap door. So it opens easier basically. It's not

on a mechanized hinge. So if you opened it and push it farther past it's [sic] opening point, it used to click into place basically. There was like a pin in the mechanism that would lock into place and keep the door from closing. In my recent events out there, that mechanism is not functioning.

Q.      Do you know if that was in – that mechanism was in place and useable in 2015?

A.      I can't recall.

Q.      Do you know if that mechanism was in place and useable in 2016?

A.      I can't recall.

Q.      Same question as to 2017?

A.      I can't recall.

Q.      How about the door on the left, was there a similar mechanism that could be used to push the door past its opening point and allow something to click and keep it open?

A.      No.

[¶33]  While the above testimony is evidence that at some unspecified point in time, the Rendezvous Center's west side doors had a built-in propping mechanism that may have become inoperable, it is not evidence from which we may reasonably infer that the block or brick that Ms. Varela tripped over in December 2015 was placed in the Center's doorway because of a defect in the doors. The testimony does not tie the malfunction to December 2015, and the record contains no evidence that the doors had the same or any built-in propping mechanism at that time. Moreover, the record contains no evidence of how the brick or block came to be placed in the doorway on the evening of Ms. Varela's injury, no evidence identifying the person who placed the object there and his or her reason for doing so, and no testimony from anyone associated with the Santa's Helpers event concerning their experience with the doors that evening.

[¶34] Under the Governmental Claims Act, a "governmental entity and its public employees . . . are granted immunity from liability for any tort except as provided by W.S. 1-39-105 through 1-39-112." Wyo. Stat. Ann. § 1-39-104 (LexisNexis 2019). It is undisputed that the Fairgrounds is a governmental entity, and it thus made a prima facie showing that it was entitled to summary judgment on its assertion of immunity. Because

16

the Act is "closed-ended," the burden then shifted to Ms. Varela to identify an applicable exception to the Fairgrounds' immunity. *See The Tavern, LLC v. Town of Alpine*, 2017 WY 56, ¶ 42, 395 P.3d 167, 178 (Wyo. 2017) (Act is a "closed-ended tort claims act," so party asserting claim must specify an applicable exception); *see also Kaufman*, ¶ 14, 442 P.3d at 308 ("Once a prima facie showing is made, the burden shifts to the party opposing the motion to present evidence showing that there are genuine issues of material fact."). Concerning burdens of proof, our Court has said:

> The burden of proof is upon the party asserting the affirmative of an issue, using the latter term in the larger sense and as including any negative proposition which such party might have to show. If he alleges a fact that is denied, he must establish it. He is the actor, and as such remains so throughout the case as to the allegations which he makes, or rather must make. Having alleged the truth of a matter in issue, he must prove it.

*Energy Transp. Systems, Inc. v. Mackey*, 650 P.2d 1152, 1158 (Wyo. 1982) (quoting *First National Bank of Morrill v. Ford*, 30 Wyo. 110, 216 P. 691 (1923)); *see also Frank Stinson Chevrolet, Inc. v. Connelly*, 356 N.W.2d 480, 483 (S.D. 1984) ("The test for determining which party has the affirmative of an issue, and therefore the burden of establishing a case, is found in the result of an inquiry as to which party would be successful if no evidence were given, the burden being on the adverse party."); *Bogdanski*, ¶ 18, 408 P.3d at 1160-61.

[¶35] Because a party asserting an exception to immunity is asserting the affirmative of that issue, the burden is on that party to prove that the exception applies. Accordingly, the burden on summary judgment shifted to Ms. Varela to show that genuine issues of fact exist concerning the applicability of Wyo. Stat. Ann. § 1-39-106. She has not met her burden.

[¶36] On the record before us, we are left to guess why the block or brick was in the Rendezvous Center doorway when she was injured, and we can only speculate as to the operation of the west side doors on that evening. Such speculation and guesswork do not establish an issue of material fact. *See Kaufman*, ¶ 23, 442 P.3d at 311 ("Speculation, conjecture, the suggestion of a possibility, guesses, or even probability are insufficient to establish an issue of material fact.") (quoting *RB, Jr. by and through Brown v. Big Horn Cty. Sch. Dist. No. 3*, 2017 WY 13, ¶ 30, 388 P.3d 542, 551 (Wyo. 2017)); *see also Cook v. Shoshone First Bank*, 2006 WY 13, ¶ 44, 126 P.3d 886, 896 (Wyo. 2006) ("Guesswork is not a substitute for evidence or inference, and inference cannot be based on mere possibility.") (quoting *Jones v. Schabron*, 2005 WY 65, ¶ 23, 113 P.3d 34, 39-40 (Wyo. 2005)). The district court thus properly granted the Fairgrounds summary judgment on its

asserton of immunity and the applicability of the Wyo. Stat. Ann. § 1-39-106 exception to immunity for operation or maintenance of a building.

## B.  Operation and Maintenance of the Rendezvous Center as a Recreation Area

[¶37]  Ms. Varela alternatively argues that the Rendezvous Center is a recreation area, and that under our precedent, the scope of the waiver for negligent maintenance and operation of a recreation area is broad enough to encompass the Fairgrounds' failure to prevent the use of objects to prop the west side doors.  We disagree.[4]

[¶38]  Ms. Varela cites *Weber v. State*, 2011 WY 127, 261 P.3d 225 (Wyo. 2011), and *DiVenere v. University of Wyoming*, 811 P.2d 273 (Wyo. 1991), to support her argument that Wyo. Stat. Ann. § 1-39-106 broadly waives a governmental entity's immunity for the inspection of recreation areas and oversight of activities therein.  Her reliance on these two decisions is misplaced.

[¶39]  In *Weber*, the plaintiff filed a personal injury action against the State after he was burned by hot mineral water in a steam room at a privately-run facility in Hot Springs State Park.  *Weber*, ¶¶ 3-7, 261 P.3d at 226-27.  We held that the State's immunity was waived under section 106 and that the waiver extended to the plaintiff's claims that the State had been negligent in approving the design and construction of the steam room and in failing to properly oversee the property and/or inspect for safety concerns.  *Id.* ¶¶ 22-24, 261 P.3d at 231-32.  We reached that conclusion based in large part on the enabling legislation for Hot Springs State Park, and on what the legislature intended the State to be responsible for in the park's operation.  *Id.* ¶¶ 19-24, 261 P.3d at 230-32.  Those unique circumstances are not present here, and Ms. Varela has offered no basis to extend the *Weber* holding to the Fairgrounds or its Rendezvous Center.

[¶40]  In *DiVenere*, the plaintiff was injured when she fell on ice on a concourse leading to the upper deck at the University of Wyoming's football stadium.  *DiVenere*, 811 P.2d at 274.  This Court held that the stadium was a recreation area and that because the concourse was part of its physical structure, the University's immunity was waived under Wyo. Stat. Ann. § 1-39-106.  *Id.* at 275-76.  The issues in *DiVenere* were: 1) whether the football stadium was a recreation area; and 2) if so, whether the concourse was part of the physical structure of the recreation area and thus within the section 106 waiver, or a separate sidewalk or ramp and thus outside the section 106 waiver.  *Id*.  *DiVenere* did not consider or address the types of claims that fall within the scope of the waiver under section 106.

[¶41]  Since *DiVenere,* we have made it clear that whether a facility is considered a building or a recreation area, the waiver of immunity under Wyo. Stat. Ann. § 1-39-106

---

[4] Because the result in this case is the same either way, it is unnecessary to the Court's decision to determine whether the Rendezvous Center is a building, a recreation area, or both.

extends only to negligence claims associated with the function of the physical attributes or structure of the facility. *Fugle*, ¶ 17, 353 P.3d at 739. In *Fugle*, we explained:

> Ultimately, we find no reason to conclude that the legislature intended for the waiver of immunity from liability in the operation or maintenance of a recreation area to apply to all activities undertaken within a particular recreation area. Rather, we conclude that the legislature intended to limit the waiver of immunity to negligence associated with the function of the physical attributes or structure of the recreation area.
>
> Consequently, for purposes of our analysis in the present case, the "recreation area" at issue is not distinguishable from the "building" under Wyo. Stat. Ann. § 1-39-106. As a result, the waiver of immunity from liability for operation or maintenance of the recreation area in this case is co-extensive with the waiver for operation or maintenance of the building.

*Fugle*, ¶¶ 17-18, 353 P.3d at 738-39.

[¶42] Based on our holding in *Fugle*, Ms. Varela's claim that the Fairgrounds was negligent in its operation and maintenance of the Rendezvous Center as a recreation area suffers from the same defect as her building claim. She has not presented sufficient evidence of a physical defect in the building to establish a genuine issue of material fact that would preclude summary judgment on the basis of the Fairgrounds' immunity.

[¶43] Affirmed.

19